ALEXANDER and Another *v.* DUNN.

*A.* and *B.*, on the 5th of *October*, 1847, agreed in writing to receive from *C.* between fifty-five and seventy pork hogs, to be delivered to them at their pork-house in *G.* net, for which they agreed to pay *C.* 3 dollars per hundred pounds net, &c. The hogs were to average two hundred pounds net, and to be delivered in *December* thereafter, and the money was to be paid on the delivery of the hogs.

*Held*, that *C.* was to deliver to *A.* and *B.* slaughtered hogs.

*Held*, also, that the hogs purchased by *A.* and *B.* were the hogs owned by *C.*

when the contract was made, and that if *C.* did not then own a sufficient number which could at the time for delivery be made to meet the average weight required, *A.* and *B.* were released.

Assumpsit by *C.* against *A.* and *B.* The declaration contained three counts. The first and second were upon the foregoing agreement, one averring a delivery agreeably to contract and a refusal to pay, &c.; the other averring a tender and refusal to receive. The third was a common count for goods sold. On the trial, *A.* admitted that, at the date of the contract, he had not hogs enough of his own which could be made to fill the contract within the time specified. He also admitted that of the fifty-nine hogs delivered, fifteen, averaging two hundred and eighty pounds, were purchased by him a day or two before the delivery, as he was driving his own hogs to *G.* to be slaughtered, without which hogs it was admitted that he could not have filled his contract. It was also in evidence that in *November, C.* told *A.* that his (*C.'s*) hogs would not fill the contract, and applied to *A.* to let him buy other hogs to make out the number and weight required, but that *A.* objected, saying that he had contracted for the lot of hogs owned by *C.* at the date of the contract. At the time of this conversation pork had fallen to 2 dollars per hundred.—It was also in evidence that on the morning of the day the hogs were slaughtered, *A.* told *C.* that said fifteen hogs would not be received under the contract, but he would allow him 2 dollars a hundred for them, but that if *C.'s* own hogs filled the contract, he would take them accordingly; if not, they would have to take their chance with the other pork. *C.* replied that he would bring the hogs to the pork-house in the morning.—It was also in evidence that *A.*, on that very day, instructed his agent to receive the hogs when *C.* should come to the pork-house, and that the agent received them without objection except as to one tainted. Upon these facts, the Court instructed the jury, that it was a contract by *C.* to deliver specific hogs which, at the time of the contract, belonged to *C.*; that, therefore, *A.* and *B.* were not bound to receive any hogs which *C.* might afterwards buy; but that if *C.* tendered to *A.* and *B.* as well a number of hogs thus afterwards purchased by him, as some of his own belonging to him at the date of the contract, so as to make the number, weight and quantity of pork hogs according to said contract, and *A.* and *B.* received them under that contract, the jury ought to consider them as waiving all right to object on the ground that they were not the same hogs contracted for; and they would, in that case, be liable to pay according to the written contract. *Held,* that these instructions fairly presented the issue to the jury.

After the retirement of the jury in a civil case, one of the jurors left the room unaccompanied by the bailiff, and was absent fifteen minutes. *Held,* that this was not sufficient of itself to set aside the verdict.

Motion for a new trial on the ground that a prejudiced juror was called to fill up the panel after the defendants had exhausted their right of challenge. *Held,* that the right of challenge for cause could not be exhausted.

*Held,* also, that if the juror was permitted to be sworn, without being interrogated as to his competency, the objection was waived.

*Held,* also, that if the juror was thus examined, it must be presumed, the contrary not appearing, that he was impartial.

The jury in a cause in which a calculation of various items was involved, were

May Term,
1854.

ALEXANDER
v.
DUNN.

May Term,
1854.

ALEXANDER
v.
DUNN.

Friday,
May 26.

permitted by the Court to take with them, in their retirement, a paper containing an estimate of counsel as to what was due to the plaintiff, the Court informing them that the paper was not evidence. *Held*, (the Supreme Court disapproving the practice) that this was not error.

APPEAL from the *Owen* Circuit Court.

STUART, J.—Assumpsit by *Dunn* against *Alexander* and another. The declaration contained three counts. The first and second counts are on a special agreement; the one averring a delivery agreeably to contract, and refusal to pay, &c.; the other averring a tender and refusal to receive. The third is a common count for goods sold.

The special contract declared upon is as follows, viz.: "*Gosport, October* 5, 1847. We this day agree to receive from *Samuel F. Dunn* between fifty-five and seventy pork hogs, to be delivered to us in our pork-house in *Gosport* net, for which we agree to pay him 3 dollars per hundred pounds net. Said hogs all to average two hundred pounds net. Said hogs to be delivered in the month of *December* next. The money to be paid on the delivery of the hogs. [Signed] *W. D. Alexander & Co.*"

Some controversy arose on the trial as to the meaning of the word "pork hogs," used in the contract—whether it was contemplated that the hogs should be delivered alive or slaughtered. Taken in connection with the place of delivery, the pork-house of *Alexander*, and the word "net," we think slaughtered hogs were clearly intended. The place here fixes their condition. The pork-house is the place for weighing, cutting up, &c., while had the slaughter-house of *Alexander* been indicated, live hogs would have been plainly intended by the parties.

*Dunn* proved that sixty-nine hogs were delivered to *Alexander* within the time provided in the contract; that they were weighed, inspected, and passed back into the cutting room of the Messrs. *Alexander*. The weights were taken down by the witness *McPheeters*, and also by an employee of the establishment. Their two memoranda corresponded as to the lot delivered. The individual weight of each hog which the paper contained was wholly immaterial; while the average weight, which was

material, was a simple act of division, the elements of which were furnished, not by the paper alone, but by other evidence. So that no material conclusion which the jury might deduce from the evidence, depended upon the memoranda solely. Besides, it had passed such test, under the scrutiny of *Alexander* himself, as was well adapted to secure accuracy. And had the course of the evidence been such as to render its contents important, it is not clear that its admission as an element for the consideration of the jury, in ascertaining the weight of the hogs, would have been error. But as the evidence stood, its introduction was immaterial and harmless.

It is objected that owing to the state of the weather, the hogs, when delivered, were in a spoiling condition. But as they were delivered by one party and inspected and received by the other, this objection comes too late. *Alexander's* agents inspected each hog as it was weighed. Such hogs as were not merchantable, and in a proper condition for packing, the agents of *Alexander* should have refused to receive. They did refuse one large hog, on the ground that it was spoiling. This, of itself, was an implied approval of all the rest. Weighing, inspecting and passing back the other sixty-nine to be cut up, was in effect saying that they were merchantable and in good packing condition. If it were otherwise, the agents of *Alexander* were at fault, and not *Dunn*.

On this point also the jury had all the evidence before them, and their conclusion seems to be the only one deducible from the facts. That *Alexander* subsequently lost most of his purchase by taint existing at the time the hogs were delivered, without any fraud on the part of *Dunn*, is *Alexander's* misfortune, resulting from the selection of his agents.

We will further briefly notice one or two other minor points, before approaching the main question in the case.

It seems that after their retirement, one of the jurors left the room unaccompanied by the bailiff, and was absent fifteen minutes. This might have been gross misbehavior in the juror, and perhaps also in the officer having the jury

in charge. But in the absence of any other improper conduct on the part of the juror while thus absent, the act is not of itself sufficient to set aside the verdict.

It is also complained, that a prejudiced juror was called to fill up the panel, after the defendants had exhausted their right of challenge. The right of peremptory challenge might have been exhausted, but not the right of challenge for cause. It was in the power of the defendants, at the proper time, to disclose his prejudice to the Court, by the application of the ordinary test. If, instead of doing so, they permitted the juror to be sworn, they have no reason to complain. If the juror was examined touching his competency, we must presume that his impartiality was satisfactorily shown to the Court, unless it clearly appear by the record, as in the case of *Goodwin* v. *Blachley et al.*, 4 Ind. R. 438, that the juror was not wholly indifferent.

The jury were permitted to take into their retirement a paper containing the estimate of counsel as to the amount due *Dunn*. At the same time they were instructed by the Court, that such paper was not evidence. What influence such a paper could have, seeing that all the materials necessary to an almost mathematical conclusion, were fully disclosed in the evidence, it is not easy to see. It is thought by a majority of the Court not to be error. But since it was not a paper in the cause, nor placed in the hands of the jury by consent, and might be made the medium of fraud and abuse, the practice is, to say the least, by no means commendable.

But the main question in the case is, whether *Dunn* is entitled to recover under the special contract, or on the count for goods sold and delivered.

It was admitted by *Dunn*, in open Court, that at the date of the contract, *October* 5, 1847, he had not hogs enough of his own, which could be made to fill the contract within the time specified. *Dunn* further admitted that of the sixty-nine hogs, fifteen averaging two hundred and eighty pounds, or nearly so, were purchased by him as he was driving his own hogs to *Gosport* to be slaughtered.

Without these fifteen hogs, purchased a day or two before the 30th of *December*, 1847, it was admitted that *Dunn* could not have filled the contract.

It was in evidence that in *November*, *Dunn* told *Alexander* that his own hogs would not fill the contract, and applied to *Alexander* to let him buy other hogs to make out the number and weight required; that *Alexander* objected, saying that he had contracted for the lot of hogs owned by *Dunn* at the date of their contract. At the time of this conversation, pork had fallen to 2 dollars per hundred. It was further in evidence, that at the time of the making of the contract, the hogs sold were in *Brown* county. Also, that on the morning of the day the hogs were slaughtered, *December* 29, 1847, *Alexander* told *Dunn* that the fifteen hogs purchased of *Burton* and *Sink* would not be received under the contract, but that he would allow him 2 dollars per hundred for them. That if *Dunn's* own hogs filled the contract, he would take them accordingly, but if not, it would have to take its chance with other pork. That *Dunn* replied he would bring the hogs to the pork-house in the morning.

These facts are relied upon by *Alexander*, to show that *Dunn* had abandoned the contract, and delivered the hogs on this second proposal of *Alexander*.

On the other side, it is shown that *Alexander*, on that very day, instructed his agent, that when *Dunn* came to the pork-house with his hogs, he should receive them, and have no difficulty with him. They were received without objection, except as to the one tainted.

This *Dunn* relies on as a waiver of the objection taken to the purchase of part of the hogs, and an acceptance of the whole under the contract.

The question was thus presented to the jury by the evidence, whether *Dunn* had acceded to the new terms proposed by *Alexander* on the 29th of *December*, or *Alexander* had received the hogs under the written contract. It was a question of fact, peculiarly within their province to decide; and they found that the hogs were delivered under the written contract.

May Term,
1854.

ALEXANDER
v.
DUNN.

With this finding we are not satisfied. But if the instructions were correct, and fairly presented the issue to the jury, we adhere to the settled policy of the Court, not to disturb the verdict though we could not concur in it.

The instructions, so far as they relate to this part of the case, are the following:

"It is a contract by *Dunn* to deliver specific hogs which, at the time of the contract, belonged to *Dunn.* Therefore the defendants, under such a contract, would not be bound to receive any hogs which *Dunn* might afterwards buy. If, however, *Dunn* tendered to defendants as well a number of hogs thus afterwards purchased by him, as some of his own belonging to him at the time of the contract as therein stated, so as to make the number, weight and quantity of pork hogs according to said contract, and the defendants received them under that contract, the jury ought to consider the defendants as waiving all right to object on the ground that they were not the same hogs contracted for; and they would, in that case, be liable to pay according to the written contract."

It is well settled that *Dunn* could not purchase hogs to fill the contract. The hogs purchased by *Alexander* were the hogs owned by *Dunn* at the time the contract was made. If *Dunn* did not then own a sufficient number which could at the time for delivery be made to meet the average weight required, *Alexander* was released. *Mason* v. *Cowan's Administrator*, 1 B. Monroe 7. Such was admitted to be the fact.

The question then turns on the waiver of *Alexander.* Did he waive his right to insist on a strict compliance, permit *Dunn* to purchase other hogs, and accept the hogs thus purchased as *Dunn's* within the terms of the contract?

A majority of the Court think the foregoing instructions fairly present the issue to the jury, and, therefore, affirm the judgment.

The minority are of opinion that the instructions of the learned judge, as applied to the facts, tended to mislead the jury, and that therefore the judgment should be reversed.

STUART, J., dissented from the opinion of the Court as to the instructions.

*Per Curiam.*—The judgment is affirmed with costs. Cause remanded, &c.

*O. H. Smith* and *S. Yandes*, for the appellants.

*G. G. Dunn*, for the appellee.