GEORGE A. MEIGS & WILLIAM C. TALBOT *vs.* STEAMSHIP NORTH-
ERNER.    STEAMSHIP NORTHERNER *vs.* STEAM-TUG RESOLUTE.
IN ADMIRALTY.    CROSS LIBELS.

It is as imperative upon a steamship navigating Puget Sound, as like vessels
navigating the seas, to observe the rules established by the Board of In-
spectors, under the act of Congress of August 30, 1852.

The failure of a steamship to exhibit the required lights, when approaching
another steamship, complying with the law, in this respect, does not ex-
cuse the latter from faults contributing to a collision.

A steam vessel without lights is in fault, if she fails to govern her movements
in accordance with the lawfully presented lights of an approaching
steamer.

When a collision is the result of mutual faults, damages and costs should be
equally apportioned.

APPEAL from the Second Judicial District, holding terms
at Olympia.

Opinion by McFADDEN, Chief Justice.

This cause was heard in the District Court sitting in admi-
ralty, for the Second Judicial District, and from the decree
therein rendered, appealed to this Court. Like most collision
cases, the testimony is not only voluminous, but is exceedingly
contradictory. Counsel have also been heard most patiently in
the elaborate arguments which they have submitted, to us, on
the law and the facts. It will be observed that there are cross
libels, and the determination of the issues in one case must nec-
essarily dispose of both causes.

In the examination of this case, we do not deem it neces-
sary to refer to all of the evidence which was read in the cause.
Much of it is from parties interested in justifying their own
conduct; and while we do not deem it necessary to reflect upon
the character of this testimony, we shall only advert to such of
it as is necessary to elucidate the points on which we think the
cases turn.

On the tenth day of October, 1858, the steamship *North-erner*, owned by the Pacific Mail Steamship Company, was on her voyage from Olympia to San Francisco with the United States mails, freight and passengers, when, some ten or twelve miles below Olympia, she was met by the steam-tug *Resolute*, owned by Meigs & Talbot, with freight and passengers, bound for Olympia. The *Northerner* when first seen, was off the Jeal, or Dofflemyer point, and entering Dana's passage. The *Resolute* was rounding Johnson's point, to enter the same passage. The *Resolute*, on turning Johnson's point and seeing the lights of the approaching steamer, which she correctly supposed to be the *Northerner*, (having learned that she had gone up to Olympia,) placed a lantern at the side of her wheel-house, and had at the time a light in her engine room.

When the look-out on the *Northerner*, as well as the officer in charge of her deck, first saw the light of the *Resolute*, it was a question of great doubt as to the character of the light—whether a light upon the shore, on board a sail vessel, or whether upon any vessel at all. From the time said look-out first saw the light, which subsequently proved to be the light of the *Resolute*, and reported her to the officer in charge of her deck, we hear nothing more from him. Whether he remained upon the look-out, or whether he withdrew from the discharge of his duty as look-out, are questions in reference to which we have no proof; and from a critical examination of the evidence, we do not learn that any particular precautions were taken to discover the character of the light, which had first been seen some five miles distant. The night, it appears, was a clear, starlight night—no fog, and but few clouds, and yet in Dana's passage, (a passage over one mile in width, and free from shoals and sand bars), at high tide, the two steamers collide, to the great risk of life and property.

The evidence shows that the *Northerner* was properly equipped with lights, in conformity to the regulations prescribed by the inspectors, under the act of Congress of 1852. She had the three lights, red, green, and white, properly shielded and protected, as required by the said regulations. The officer

in charge of her deck was an Umpqua river pilot. How or why he was in charge of her deck does not appear. Possibly for the convenience of others. His conduct as a seaman hitherto does not seem to have been impeached—he had some familiarity with the Sound, and yet, strange as it may appear, there was the most manifest inattention on his part, in the management of the vessel.

From the time when the light (which proved to be the light of the *Resolute*,) was first reported to him, up until it was too late to avoid a collision, there was the greatest neglect in adopting the usual and ordinary precautions to ascertain the motion and character of the light. There is considerable testimony as to the possibility of determining the direction of a single light, when the observer is on a vessel in motion.

It is perhaps possible, under certain circumstances, to determine the direction of a single light, but in the case of a single light approaching as this one was, we think in was almost an impossibility. With ordinary attention, the change in position, and relative distance of this light, must have been perceptible to the look-out on board of the *Northerner*, as well as to the officer in charge of her deck. So far as they then knew the the light, it might have been a vessel at anchor, yet the speed of the *Northerner* is kept up. The light might have been on a sail vessel passing up the Sound, yet there is no slowing of the engines; and not until it is too late to avoid the collision, is there a single movement made precautionary in its character, to avoid the disaster.

From the examination of the testimony in this cause, we cannot discover that all the prudence and caution necessary to be exercised, and which are the characteristics of good seamanship, were resorted to for the purpose of preventing this collision.

We are therefore of opinion, that the conclusions arrived at by the District Court, on the hearing of this cause below, were correct.

1. The *Northerner* was in fault, that she had not sufficient

look-out, or if she had he was negligent, and inattentive to his duties. The look-out on the *Northerner* saw the light of the *Resolute* some considerable time before the collision, and from the time he first saw and reported the light, to the time of the collision, no further attention would seem to have been given to the subject, until it was too late to prevent the vessels from coming together.

2. The *Northerner* was in fault, that on the approach of the vessel, when they say they were in doubt as to the character of the light, they did not exercise proper vigilance to ascertain the character and course of the approaching vessel, which subsequently proved to be the steam-tug *Resolute.*

3. The *Northerner* was in fault, in not having a competent officer in charge of the deck, at and immediately before the time of the collision, instead of one whose want of qualification and skillfulness contributed to the collision. It does not appear from the testimony that the party in charge of the deck was even an officer of the ship.

4. The *Northerner* was in fault, on discovering that the lights were approaching her, that her officer in charge of her deck did not seasonably and effectually change the course of the vessel, blow her whistle, or slow or stop her engines so as to prevent a collision. These are the usual and ordinary precautions, in cases of doubt or emergency, to prevent disaster.

It therefore becomes necessary for us to examine the conduct of the *Resolute,* and her equipments, to see whether she is without blame.

In this connection, the first question presented for our consideration is, was the *Resolute* properly equipped with lights, in conformity with law? In the libel, it appears the *Resolute* was of some one hundred and thirty tons burthen or thereabouts, and at the time of, the collision she was enrolled and licensed for the coasting trade, and was employed in the business of commerce and navigation, between ports and places on the waters of what is commonly known as Puget Sound, and the waters connected therewith, and at the time of the collision,

on the evening of the 10th day of October, 1858, was making for the port of Olympia, with freight and passengers. It is averred that the *Resolute*, when she left San Francisco for the waters of Puget Sound, did so ostensibly to be used as a tug, or tow boat, but we look through the testimony in vain to find that she was ever employed in any other capacity than in carrying freight and passengers.

The act of Congress of 30th of August, 1852, for the better regulation of vessels navigated, in whole or in part, by steam, provides for a board of inspectors, whose duty it is, under the provisions of the laws of Congress, to make such rules and regulations as may be necessary for the better protection of life and property, exposed to the incidents and risks of steam navigation. The regulations adopted are before us, and constitute a part of this cause. It is alleged on the part of the *Resolute*, that these regulations are inoperative, so far as she is concerned, on the ground of want of notice.

We confess we cannot see the pertinency of this objection. If she had continued in her capacity as a tug, or tow boat, the objection might be pertinent, but when she doffs her character as a tug, or tow boat, and engages in the carrying of freight and passengers, we do not see how she is to escape the responsibility of conforming with the laws enacted for the regulation of such vessels. There is nothing before this Court going to show that the *Resolute* ever was engaged on the waters of Puget Sound, or the waters adjacent thereto, as a tow boat; on the contrary, we know her, and know her alone as a boat engaged in commerce.

The subject of lights in the navigation of steam vessels is truly, so far as the public are concerned, an important one.

The sad disasters which have so frequently attended the navigation of ocean steamers, have given rise to much reflection on the part of those whose duty it is to provide safe-guards for the lives and property of those, who are compelled "to go down into the sea in ships."

Before the passage of the law creating the board of in-

spectors, and the adoption of the regulations which now exist it was a subject which strongly appealed to the soundest discretion and judgment of those exercising authority in our courts of admiralty. Judge Kane, in the case of the steamship *Osprey vs. bark Delaware*, in 1852, and before the passage of the law referred to, speaking on the subject of lights, and the want of legislative authority, says: " So important is some such regulation, that I have been solicited, more than once, to assume its existence and enforce its observance." We think the law is operative in all its parts, and the obligation to observe its provisions imperative. While we think it obligatory upon sea-going vessels to equip themselves with the lights as prescribed by the board of government inspectors, we think the vessels navigating the sea, or the waters of the Sound, on approaching a vessel equipped in conformity to the law, should be governed in her approaches, by the lights of the vessel which may have conformed to the law. If this be not so, there is no safety for any vessel, although she herself may, in every particular, conform to the law.

In this case it is notorious, from the evidence, that the parties in charge of the *Resolute* knew nothing of the signification of the lights which were borne on the *Northerner*; and this is the more extraordinary, as the parties professed great experience as mariners.

The lights on the *Northerner* were seen some four or five miles distant—the Straits were a mile in width—there was no doubt as to the character of the lights, yet, in disregard of their signification, there is a persistent attempt to pass her to the opposite side of the Straits, for the purpose of passing to the starboard, and this without regard to the course of the *Northerner*, as indicated by her lights. We think there was great mismanagement in this.

It is also claimed on the part of the *Resolute*, that the collision was a consequence resulting from the change of direction given to the *Northerner* immediately before the vessels came together.

On this subject we have carefully examined the testimony

of all the witnesses. The most satisfactory is the testimony of Mr. Clark. He is a disinterested witness, was a passenger on the *Northerner*, and on deck before and at the time the vessels came together. He says: " I came on deck immediately after dinner, it was dusk, then; we finished dinner by candle-light; I came on deck to smoke a cigar. I walked forward to the fore-rigging, on the starboard side. I saw a light or lights on the opposite side of the Sound, which I took to be a light or lights on shore. I then walked aft, and when I came back to the same fore-rigging, I noticed that the lights were near a mid-channel. I then made up my mind that it was a canoe going down the Sound, apparently, I judged, running parallel with us. I stopped at the fore-rigging, on the starboard side, to see what it was; after standing there a minute or so, I noticed that it was a steamer, coming towards us at an angle of about forty-five degrees. I saw she would strike us about where I stood; I then ran aft—to get out of the way—to the port side of the smoke stack. When she struck us I fell into the lee scupper. She struck us on the starboard bow and slid along aft under our wheel, and then went clear. The *Northerner* stopped her engine just before the collision, and after the collision was disabled.

Now here is a passenger who first sees the light of the *Resolute* on the opposite side of the Sound, traces it to mid-channel, then discovers the vessels approaching each other, at an angle which must bring them together. The starboard light and the white light of the *Northerner*, at least, plainly perceptible to those on board the *Resolute*. Both of the vessels passing through the water rapidly—one at the rate of twelve, and the other at the rate of nine miles per hour, and yet, remarkable as it may appear, not a single precaution seems to have been taken by those in charge of either of the vessels. The night comparatively clear, starlight, and free from fog, yet no whistle is blown by either of the steamers; the speed remains unchecked, and it is only at the last moment, when it is too late, that we find the preparatory arrangements made to avoid collision.

The *Resolute*, on rounding Johnson's point, saw the lights of the *Northerner*, bearing off the port-bow of the *Resolute.* There was no mistake as to these lights, for the parties on the *Resolute* correctly supposed them to be the lights of the *Northerner*. The master of the *Resolute* then steers across for the opposite shore—in doing so crossed a channel more than a mile in width, in an oblique direction, and this for the purpose of passing between the *Northerner* and her port shore.   The green and white lights were exhibited to the *Resolute*, indicating the *Northerner* was leaving the greater part of Dana's passage on her starboard.   The master of the *Resolute* persisted in attempting to cross the bow of the *Northerner*, in order to leave her on his port side.   As to whether the red light was seen from the *Resolute* seems to be doubtful.   Pray says, that just before the collision, he saw the port side of the *Northerner*, but does not recollect as to the red light.   Clark and other witnesses state that the green and white lights of the *Northerner* were visible to the *Resolute*, during the approach of the vessels, and detail with considerable minuteness the approach of the *Resolute*, from a point of time prior to the time when she was discovered to be a steamer, up to the time of collision. We have examined the testimony of all the witnesses who speak of the change of position on the part of the *Northerner*.   The testimony is conflicting in its character, and we are unable to satisfy ourselves that the danger of collision was increased by the starboarding of the helm of the *Notherner;* on the contrary, if this had not been done, we think the escape of the *Resolute* would have been almost impossible.

Mr. Clark—This witness says: "When I first saw the light of the *Resolute*, the *Northerner* was running around a point, apparently with the port shore close aboard; this gave to whatever was coming, the whole width of the Sound."   We think that the attempt of the *Resolute*, after she saw the lights of the *Northerner*, to pass across the Sound with a view of passing to the starboard, was a mistake, and contributed materially towards bringing the vessels together.   Looking at this matter with all the lights before us, and giving due consideration to all that has

been argued by counsel, we are constrained to the belief that that there was great incapacity on the part of those having charge of both vessels, or else, a negligence almost criminal.

We think the conclusion arrived at by the District Court, that the *Resolute* was in fault, as follows, was correct:

1. The *Resolute* was in fault, that she was not equipped with the lights prescribed by the board of government inspectors, under the act of Congress of August 30, 1852. The *Resolute* is not within the exceptions provided for in said act. She was not only engaged in carrying freight, but also passengers at the time of the collision. Considering the strong inclination so frequently manifested by the jurists who preside over the several admiralty courts, as to the necessity of a proper observance of a system of lights, to prevent the sad disasters which have so frequently occurred on our waters, and this too in the absence of any law of Congress upon the subject, it is too late now to ignore a system established by law, sanctioned by experience, and so necessary to the protection of the lives and property of our citizens.

The necessity for the observance of these rules, is quite as imperative upon vessels navigating the waters of Puget Sound, as upon the high seas.

The lives and property of our citizens, and the commerce of Puget Sound, require, quite as imperatively, the protection and security of salutary regulations, as life and property in other sections of the country, and we can see no reason why the navigation of these waters should constitute an exception.

But the failure to show the lights, as required by law, does not, of itself, throw the entire responsibility upon the offending party, when the other vessel was in fault.

2. The system of lights established by the board of inspectors, in conformity with the act of Congress, when read and understood, as they must and should be by mariners, speaks a language which, on the exercise of ordinary diligence, must ever prevent collision.

We think it is therefore incumbent on steam vessels navi-

gating the waters of the Sound, in default of lights themselves, as prescribed, to be governed in their movements by the movements of the approaching vessel properly equipped with lights, when the approaching vessel is controlled by reasonable skill, and good seamanship. We therefore think that the *Resolute*, although not carrying the lights prescribed by the inspectors, should at least have been governed by those lights, while it is evident that those in command of the *Resolute* did not even understand the signification of the lights. The language of lights, to them, was an unknown language, although common to the seas for years. We therefore think in this, that the *Resolute* was in fault.

3. We are satisfied from the testimony, that these vessels were not approaching head to head, and therefore think that the effort of the *Resolute* to pass to the starboard was not in conformity with good seamanship. She therefore erred in her attempt to pass to the starboard; a proper observance of this would have prevented a collision, as the Straits were a mile in width, and no difficulty from want of water, shoals or bars.

We are of the opinion that this is a case of mutual fault, and the damage should be apportioned in conformity with the rule recognized by the Supreme Court of the United States, in the case of the schooner *Catharine et al. vs. Dickinson et al.*, 17 Howard, 177. We therefore think the costs should be equally divided.

On the subject of damages we see no reason to differ with the conclusion arrived at by the Court below. We are not satisfied that in cases of mutual fault there should be any allowance made for losses arising from the detention during repairs. We find no case in which the point was distinctly presented, and in the absence of express adjudication, we are not disposed to allow the claim.

The result will be, damage to *Northerner*, eight thousand dollars; damages to *Resolute* and freight, five thousand dollars, making the total sum of thirteen thousand dollars, being equally divided, leaving the *Resolute* to pay to the *Northerner* fifteen

hundred dollars, and one half the costs, and the costs accruing on the appeal.

Decrees will therefore be prepared accordingly, and submitted to the Court for approval.