## THE PEOPLE v. WINTERMUTE.

*1. STATUTES:* REPEAL: EFFECT. The repeal of a repealing act revives the statute originally repealed.

*2.* ———: ———: ———. The Criminal Code of 1862–3 was repealed by the Act of 1868–9, which was in turn repealed by the Act of 1872–3. *Held:* That the Code of 1862–3 was thereby revived, and its provisions governed in all criminal proceedings.

*3. GRAND JUROR:* CHALLENGE: WHEN INTERPOSED. Under a provision of the statute giving to a person held to answer a charge for a public offense, the right to challenge any individual grand juror, before the jury retires, after being sworn and charged, it is error in the court not to allow the challenge to be made as a matter of right, although no reason is shown why it was not interposed before.

*4.* ———: ———: DISQUALIFICATION. When a legal challenge is properly made to an individual grand juror, and the court refuses to entertain or consider such challenge, the juror against whom the same is made is disqualified, and his presence on the jury vitiates the whole panel.

*5.* ———: ———: RIGHT OF CHALLENGE. The refusal by the court to grant a challenge, legally interposed to a grand juror takes from the party entitled to interpose the same, one of the greatest safeguards guaranteed by law, deprives him of a substantial right, and vitiates all the proceedings.

*Writ of Error to the Yankton County District Court.*

THE defendant was indicted in the court below for the crime of murder, found guilty of manslaughter in the first degree, and sentenced to the Territorial prison for the term or period of ten years. Motions in arrest of judgment and for a new trial were made and overruled, and the cause was removed to this court by writ of error.

*Leonard Sweet, G. C. Moody, Bartlett Tripp* and *S. L. Spink,* for defendant.

*J. R. Gamble, District Attorney,* and *Jason Brown,* for the People.

KIDDER, J.—The above cause comes before this court from the county of Yankton upon *writ* of *error.* Several questions arising upon the motion for a new trial and arrest of judg-

ment were presented, but as we regard the *motion* in *arrest* decisive of the case, that question will only be considered.

The Statute of 1862–3, Criminal Code, 107, § 13, provides that, " *a person held to answer a charge for a public offense*, may challenge the panel of the grand jury, or *any individual grand juror*, before they retire, after being drawn and charged by the court."

Among the causes for individual challenge, the act embraces the following: Section 15, Sub. Div. 6, "That a state of mind exists on his part in reference to the case, or to either party, which satisfies the court in the exercise of sound discretion, that he cannot act impartially and without prejudice to the substantive rights of the party challenging."

After the grand jury in the present case had been impanelled, charge and sworn, and before they retired, Peter P. Wintermute, this defendant, " who was then held to answer a charge for a public offense " before that body, challenged an individual member thereof in accordance with the permission and for the cause specified in sub-division *six* above quoted.

The court disallowed the challenge upon the ground that the Statute of 1862–3 had been repealed by subsequent territorial legislation, and was not in force. That the presence of a disqualified grand juror vitiates the whole panel is well settled by numerous authorities, among which are the following: 1 Bish. Crim. Pro., § 884; *Commonwealth v. Cheny*, 2 Virg. Ca., 20; 1 Ch. C. L., 307–8–9; 2 Hawk. Cr. Ch., 25, § 16; *Barney v. State*, 2 S. & M., 68; *Portis v. State*, 23 Miss., 578; *Stokes v. States*, 24 Miss., 621; *Miller v. State*, 33 Miss., 356; *State v. Symouds*, 36 Me., 128; *State v. Lightbody*, 38 Me., 200.

The grand jury impanelled and the challenge thus denied, that body returned to consider whatever presentments might be made. Subsequently it indicted the defendant, thus held to answer, for murder ; and afterwards he was tried and convicted in the District Court in the county of Yankton for *manslaughter*.

If, therefore, the Statute of 1862–3 was *not* then in force, the court below, by its rulings, so far as the same are presented by the motion in arrest, gave to the defendant all the rights

to which he was entitled. If that statute *was then* in force, the right to challenge a juror for partiality and a condition of mind prejudicial to the substantive rights of the defendant was denied.

The present legal *status* of the law of 1862–3, and the place it should hold in the jurisprudence of this Territory, are the only questions we need discuss. If the law was not in force the motion in arrest should be overruled. If it was in force the judgment must be arrested.

The history of the legislation in this Territory which relates to the questions we are discussing, is this: The Act of 1862–3 was repealed by the Act of 1868–9, page 165, Sec. 799. That of 1868–9 was repealed by the Act of 1872–3, page 23, chapter 5. Section 1, of the Act of 1872–3 provides, " That chapter first of the laws of 1868–9, entitled ' An act to establish a Code of Criminal Procedure for Dakota Territory,' approved January 12th, 1869, be and the same is hereby repealed.' "

Is then the Statute of 1862–3 revived by repealing that of 1868–9, which repealed the former?

The principle of law, that the repeal of the repealing act revives the statute originally repealed, has been too often adjudicated and the principle is too well established to require elaboration or a lengthy citation of authorities.*

Blackstone, says: (Vol. 1, page 90) " If a statute that repeals another, is itself repealed afterwards, the first statute is hereby revived, without any formal words for that purpose." The same rule is laid down in *Potter's Dwarris* on Statutes, 159; in *Tattle v. Gimwood*, 3 Bing., 493; in *Commonwealth v. Churchill*, 2 Met., 118. This general principle may be found almost anywhere where the subject is discussed, and was not denied, as we understand, by the counsel who represented the People in the argument of this case.

---

*Since this opinion was announced this rule has been abrogated by Section 2132, Civil Code, which provides: " Whenever any act of the Legislative Assembly is repealed, which repealed a former act, such former act shall not thereby be revived, unless it shall be expressly so provided.

·Indeed, the rule extends further than is necessary in its application to this case. " If a repealing statute, and a part of the original statute, be repealed by a subsequent act, the residue of the original statute is revived." 9 B. and C., 354; if an act of parliament be revived, all acts explanatory of that so revived, are revived also; 2 Burr, 747.

The denial of the legal force of the statute of 1862–3, was based upon other reasons which we will proceed to consider.

Section 2 of the Act of 1872–3 provides, " That from and after the passage and approval of this act, the proceedings, practice and pleadings in the District Courts of this Territory, in criminal cases, shall be in accordance with the proceedings, practice and pleadings of the common law, *except where the same is otherwise expressly regulated by law.*"

It was contended on behalf of the People, that this section qualified the unlimited repeal of the Act of 1868–9, fixed by the first section, and introduced the common law as a rule of· practice in lieu of all statute law. In other words, it is contended that these words manifest an intention in the legislature not to revive the Act of 1862–3, but to adopt the common law in lieu of it.

Such is not the meaning of this section. In construing a statute, all the elementary writers say, it must if possible be so construed as to give an intelligent meaning to *all* the words of such statute, and any construction which necessitates the rejection, or which renders meaningless some words, and especially words to which some obvious meaning was intended, is presumptively erroneous.

When the legislature adopted the common law as the rule of practice in this Territory, " *except where the same is otherwise expressly regulated by law,*" it obviously meant something by these words, and so to construe the act as to render such words meaningless is a violation of the plainest principles of legal construction, whether of statutes or any other documents.

An examination of the criminal statutes of the Territory show, that *if* these words—*except where the same is otherwise expressly regulated by law*—do not refer to the Act of 1862–3,

as where matters of criminal practice are " regulated by law," they refer to nothing.

The first Act of Criminal Procedure passed in the Territory, was that of 1862–3. The second was that of 1868–9. Now the repeal of the Act of 1868–9 by that of 1872–3, left nothing *but the Act of* 1862–3, to which the expression quoted above could refer. Hence, we hold that these words are not meaningless, but do refer to the Act of 1862–3; and that the intention of the legislature was to incorporate the common law upon that act, and thus by the act and the common law to create a harmonious system in which the common law should constitute the ground work, and the statute specific directions in matters of criminal procedure. It is well understood by the profession in the Territory, that this statute (the one of 1862–3) was not full, *i. e.*, its provisions did not meet every emergency; therefore, the legislature could see the necessity of commingling its provisions with the common law.

The theory that the common law *alone* should be a rule of procedure seems to us unreasonable. The Common Law of England was so modified by English statutes, that at this day, to sever it and bring it to a new country and apply it without more modern machinery, is practically an impossibility. On the contrary, to receive it in connection with special statutes, is in accordance with the principles of the American system, and the principles of our jurisprudence.

It is not the duty of the court, therefore, to strike out the common law and act alone upon the statutes of the Territory, and go back to the common law alone, but to weave our statutes and the common law into one uniform texture of jurisprudence, thus construing the statutes in harmony with our modern policy and with the common law, and not adopting either to the exclusion of the other.

The next point of objection to the legal authority of the Act of 1862–3, and the doctrine of a revival of a repealed statute by the repeal of the repealing act, arises from an Act of Congress which it is contended bears upon this question; *vide* 16 U. S. Statutes at Large, 431. The section of the act relied upon is as follows:

Section 3. "*And be it further enacted*, That whenever an act shall be repealed, which repealed a former act, such former act shall not thereby be revived, unless it shall be expressly so provided."

This section is from the Act of February 25th, 1871, and is claimed as a rule of legislation, or legislative construction within this Territory.

The power making this section operative within the Territory, is claimed to be found in the following provision of the Organic Act, section 16: "That the Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within the said Territory of Dakota as elsewhere within the United States."

The question under these sections is: does the Act of Congress obtain force within the Territory so as to control legislative action? In deciding this question we must look to the *title* and *body* of the act to discover its scope and intention. Such examination shows conclusively that this act, not only has no binding force within the Territory, but was never intended to have.

The *caption* of the act is, "An act prescribing the form of the enacting and resolving clauses of *acts and resolutions of Congress*, and rules for the construction thereof."

The very purpose of the Act by Congress, as plainly expressed by the enacting power, is to furnish rules of construction for *themselves*, and the words of the clause fixes the definite limitation.

"Though the title of an act," says the author of the notes in Dwarris, 102, cannot control the plain words in the body of the statute, yet, taken with other parts, it may assist in removing ambiguities. The *intention* of the law makers, it has always been held, is the best guide for the construction of statutes.

The body of the act is in harmony with the enacting clause. It gives the form of the enacting words of a *Congressional* law or resolution, and the definition of various words which may be used therein; and then comes the section cited above as to repealing acts, and the law of construction, which, by this section, Congress adopted for *itself*.

Another rule of construction always acknowledged and acted upon, is that in determining the meaning of a law or the intention of a law maker, the evil sought to be remedied should be considered.

Congress has been enacting statutes now for nearly a century. It would, therefore, be impossible to retain in mind all the repealed acts which the repeal of the repealing acts might revive. It was, therefore, perhaps wise to establish the rule that no repealed act should be revived except by express words. However this might have been for Congress, the reason has no force within the Territory where the statutes are limited to a few years and could easily be called to mind.

But the controlling reason upon this question lies in the fact, that by the Organic Act, section 6, it is provided:· That "the legislative power of this Territory shall extend to all rightful subjects of legislation consistent with the Constitution of the United States and the provisions of this act."

This act gives to the legislature complete control of the question of legislation subject to the limitation therein named. In reference to the manner in which laws shall be enacted, or in which they shall be repealed, whether it shall be by direct words, or by implication, or repugnancy, no rule is laid down. And can it be contended, that some ten years after the Organic Act was passed, after the legislature had always acted without limit under it, that a rule expressly made for Congress itself, operates to modify or limit that Organic Act? and, therefore, laws must be passed and repealed, or revived in the Territory, just as they are passed, revived, or repealed by Congress?

Let us reverse this proposition: In the act referred to, Congress provides how *it* will enact laws, what captions, titles, etc., it will have, and how it will repeal them. Would it be contended for a moment, that if a Territorial law, duly passed, did not have the same form of heading or caption that a law of Congress has, it would be void? and, yet, this reasoning is as forcible as to the form of enacting clauses as it is to the form of repeal.

Enacting criminal procedure, is one of the "rightful subjects of legislation" in this Territory, and if Congress intended to establish a rule which would control Territorial legislation, it seems to us that it would, as it has often done heretofore, have made its provisions in the statute above referred to—in express terms—applicable thereto.

We are, therefore, of opinion, that this law of Congress does not, and never was intended to operate within the territories, and that it has no bearing upon the question at issue.

From the above reasoning and authorities, we hold that the Statute of 1862-3, under which the said challenge was made, was then and there in force, that the refusal to grant the challenge asked for, took from the defendant one of the greatest safeguards guaranteed by law, and hence the judgment in this case must be arrested.

In this opinion the court expressly declines to decide, or give any intimation as to the effect of the past proceedings upon a future prosecution. It orders the defendant into custody to answer to any indictment which may be found, reserving all questions arising upon any new indictment for future adjudication.

CHIEF JUSTICE SHANNON, DISSENTING: I dissent from the opinion filed by Mr. Justice Kidder, and from the judgment which the majority of the court have thought it proper to render in this case.

They declare they have discovered one error, " decisive in the case," and for this alone they arrest the judgment, reverse the entire proceedings, and hold the accused to await a new indictment. And, it must be borne in mind, this solitary error has relation to nothing that occurred during the progress of the trial before the jury (a trial that lasted over twenty days)—to nothing in regard to the formation of the petit jury itself—to nothing in the admission or rejection of evidence—nor to anything in the body of the charge to the jury, or in the responses of the court to the fifteen complicated and voluminous requests, or propositions of law, offered by the counsel for the defense.

To reach this alleged error, it seems to have been deemed proper and necessary to go back of all matters involving the merits, to overlook all that transpired during the trial, and not even to pause over the force and effect of the plea to the indictment. The plea in bar was an uncompelled, and a voluntary act, on the merits and traversing the facts. Prior to it, there had been no motion to set aside the indictment—no plea in abatement—no demurrer. What was, or was not, waived by these omissions and by the free choice of the plea of " net guilty," appears not to have been considered.

The pith of the alleged error, consists, it is said, in an irregularity in the formation of the grand jury, by which irregularity the presence on the panel of a " *disqualified grand juror* " was brought about.

Here at once arises the divergence of opinion; for I respectfully affirm that the grand jury was lawfully constituted, and that no " disqualified " person was a member of it.

Indeed, I think I may venture to go still further, and to affirm that no accused party in any·known criminal action, ever had a fairer or fuller opportunity for asserting his legal rights upon the organization of a grand jury, than was accorded to this party. In fact, the majority of the court candidly admit that if the Statute of 1862–3 was not then in force, the court below, by its rulings, "*gave the defendant all the rights to which he was entitled.*" By which, of course, is meant that the court below, in the organization and in the challenging of the grand jury, accorded to the accused all the rights, and afforded to him all the opportunities, to *which he was entitled by the· common law.* In the interests of justice and the due administration of law, this broad concession is of the highest value and most significant importance. And whether that statute was, or was not, in force, it follows by the irresistible strength of logic and reason, that if those sections of that code which relate to the challenging of jurors, were merely declaratory of the common law, conferring no new right and entitling the defendant to no privileges which he would not have enjoyed at common law, then there is an end to all doubt or question, and the court below did, there-

fore, extend to the defendant all his legal rights in the premises. But as this point will be hereafter considered, I shall pass it by for the present.

The first question that naturally arises and that should be examined, is: had the defendant a fair opportunity allowed him, according to law, to exercise his right of challenging the individual grand juror, George W. Delamater? This is the precise ãnd only point in the case. The defendant complained that he had not, and the majority of this court sustained his view of the matter. Without stopping here to inquire whether or not the objection was properly on the record, or at all a part of it, under well-known rules, and in order to a correct and thorough understanding of the subject, I consider it proper (even at the expense of being considered prolix) to adduce the record, so that it may answer. It discloses the following facts:

Peter P. Wintermute being under arrest, charged with the killing of Gen. McCook, was, on the 5th of March, 1874, set at liberty, by being admitted to bail to appear at the next April term, to answer to such indictment therefor as might be found against him. On the 4th of April, in pursuance of an order to that effect, the officers appointed by law duly drew the names of the sixteen grand jurors; and the venire was, on the same day, placed in the hands of the sheriff. Among the names drawn and in the venire, was that of George W. Delamater, a well-known citizen of Yankton. The venire was returnable to the 16th of April, 1874. It thus appears that from the 4th until the 16th of that month, the accused had knowledge, from the public records, of the names of all the grand jurors; and he consequently had abundant time and opportunity to make all requisite inquiries as to the character, competency, and impartiality of the citizens who were to compose the grand inquest, and more especially with reference to Mr. Delamater, a resident of his own city. On the 16th day of April, the sheriff having made return of said venire, the names of the grand jurors served (fifteen) were publicly called in open court, and they appeared and took seats. Among them, was George W. Delamater. The de-

fendant and at least three of his counsel were present, and so continued during the whole proceedings of that day. Four of the fifteen in the box, for satisfactory reasons publicly shown, and entered of record, were excused from further attendance, Mr. Delamater remaining. There being then only eleven persons in the box, the court, in pursuance of law, ordered the sheriff to summons, not from the by-standers, but from the body of the county, five good and lawful men, having the qualifications of jurors, to complete the panel, etc. To this special venire, the sheriff made due return, and the five persons thus summoned took seats in the box, making the required number.

The record next shows that the said sixteen persons were then duly *sworn to make true answers touching their qualifications to sit as grand jurors.*

Thereupon a controversy having arisen as to the competency of Matthias Bagstadt, the counsel for the defendant drew up and presented to the court, the following paper, which was duly filed:

"Now at this time, sixteen persons having appeared and "taken seats in the box as grand jurors of the county of "Yankton, comes the defendant, P. P. Wintermute, a person "held to answer to any indictment that may be found against "him at this term of the court, in person and by his counsel, "and also comes the District Attorney for said Yankton "county, and one Matthias Bagstadt having been selected, "drawn, and summoned upon the regular panel as a grand "juror, being sworn on his *voir dire* answers as to his quali- "fications, that," etc. * * * "Upon such answer the Dis- "trict Attorney asks that said Bagstadt be excluded from "serving as such grand juror, alleging that he is not compe- "tent to serve; to which said Wintermute objects, and insists "said Bagstadt is a competent grand juror of this court." The court excluded Mr. Bagstadt, to which ruling the defendant excepted, the District Attorney declaring, however, that no such exception would lie.

The next step in the proceedings was an order to summon one good and lawful person as aforesaid, to supply the vacant

place. The sheriff made return that he had summoned N. Presho, who appearing, was duly sworn as to his qualifications; and there being no objection made, he was allowed to take a seat in the box. " The court then announced that " there being sixteen persons in the box (the requisite num- " ber) the panel of the grand jury is complete; and the court " asked if there are any objections of any nature to be made, " why the said sixteen persons should not be sworn in chief " as a lawful grand jury. Immediately thereupon comes the " said Peter P. Wintermute and presents this his challenge " to the array, and moves to set aside the grand jury sum- " moned and impanelled at this said April term, for the rea- " sons," etc. After hearing and argument, this motion was overruled and the challenge disallowed. " Same day, comes " the said Peter P. Wintermute and interposes another chal- " lenge to the array and moves to set aside the panel of grand " jurors upon the ground," etc., setting forth other reasons. This was also refused, and the ruling likewise noted. " The " court then again publicly inquired if there were any further " objections of any kind or nature, why the said sixteen per- " sons now in the box, should not be sworn in chief as the " lawful grand jury of said county; and there being no ob- " jection raised or challenges made, but both the counsel of " the said Wintermute (he being then also present in court) " and the District Attorney, *stating that they had no objec-* " *tions,* at 4¾ o'clock, p. m., of said day, the court appoints " George W. Delamater as foreman of said grand jury, and " said foreman was duly sworn according to law. And after " said oath was administered to said foreman, the remainder " of said panel of grand jurors were duly sworn according to " law, by *permission of the said District Attorney and the said* " *defendant and his attorneys.*"

In view of these details extracted from the minutes, or jour-nal, of the court below, and which were spread out at length on the record before this court, how can it, with any pro-priety, be asserted that this accused party was denied, or deprived of, any of his rights? On the contrary, it is manifest that very unusual precautions, joined with most scrupulous

care, were taken to guard those rights. Attended by vigilant counsel, he had his whole day in court. The jurors had all been sworn to make true answers as to their qualifications, and competency to serve. The door of inquiry was thrown widely and invitingly open. Twice did the court publicly call on him to interpose any challenges or objections, of any kind or nature, which he might think proper to make, thereby notifying and warning him that that was the proper time to exercise the right to challenge. He and his legal advisers were active and busy in the premises, in all matters appertaining to his interests. Not himself alone, but his counsel, by these repeated notifications, were informed by the court that if they knew of any valid objection and intended to challenge, the objection must be raised and the challenge taken before the jury were sworn. It was thus more than suggested to their intelligence that if knowing a cause of challenge and it was not then taken, it must be afterward viewed as a waiver. The sixteen persons as an array, and each individual of them, were tendered to the defendant, to inquire into the nature and cause of the accusation against him. He voluntarily accepted them, and with them George W. Delamater; for the record shows that he publicly stated he had no objections, beyond those he had made, and that the panel was sworn by his permission. Finally, when Mr. Delamater was chosen as foreman, and was called to stand up to be separately sworn, no challenge to him (thus made conspicuous) was interposed. He was solemnly sworn, in the presence of the defendant, that as foreman he would not present him or any person "through malice, hatred or ill will," but according to "the truth, the whole truth, and nothing but the truth," and thus impliedly averring that he had neither malice, nor hatred, nor ill will against the accused. When impanelled and sworn they became, and were pronounced to be, the lawfully constituted grand inquest of the county. A species of judgment to that effect was rendered, when the record was made up. And when the court delivered its charge to them, it was a public judicial recognition and declaration of that fact, to-wit: of its official existence as an

appendage of the court. When once created a lawful body, it was to remain such until dissolved or broken, in some manner pointed out and allowed by law. No caprice of the Judge, no bare assertion, or *ipse dixit* of any man, could be sufficient to undo that which was thus lawfully done. To take away any of its members, or in any manner to disintegrate it, was a thing beyond the power of the court; unless, in the exercise of a sound discretion, upon some evidence, and for some good cause shown.

We now approach the eventful point in the case. It appears that, on the next day, the 17th of April, counsel for the defendant proposed to challenge Mr. Delamater, upon a general statement and broad assumption of bias—namely, that the said juror " cannot act impartially and without prejudice." The offer was supported by no affidavit alleging surprise or mistake, or excusatory of delay, omission, or default. In courts of law when a party is in default, he must ordinarily make some proof to open it, in order to be restored to the position he before occupied. But here there was not a scintilla of evidence of that or any other kind. It was not stated that a cause of challenge, unknown the day before, had been newly discovered. In fine, the offer was unaccompanied by any reason or excuse, or by the shadow of either, why the court should, at that day, and under those circumstances, undertake, in the face of objection, to break up and disorganize the grand inquest.

Moreover, the offer, as presented to the consideration of the court below and of this court, had not even the support of an affidavit of the defendant that he believed, or had cause to believe, or had been informed, the juror *was* partial or prejudiced. And in no portion of the proceedings, at any stage afterward, does the oath of anybody appear averring partiality, prejudice, or other unfitness, of that juror. In the position then occupied by Mr. Delamater, and in view of the solemn oath he had taken the day before, this was a grave charge against his honor and reputation, and tending to his infamy; and consequently no court of justice, mindful of its duties and of the law, could, for an instant, think of tolera-

ting such an accusation upon naked, idle assertion. To be then heard, it should have been verified. The court, before the final impanelling, had been satisfied that he could act impartially and without prejudice to the rights of the defendant. It had then exercised all the legal discretion reposed in it, under the existing circumstances.

Here it may be as well to observe that, in the opinion of the majority of this court, it is considered that Mr. Delamater was "a disqualified grand juror," whose presence vitiated the whole panel. But how was he disqualified? Upon what part of the record does this appear, or how was it shown? Did the bald assertion of the defendant, on the 17th, make him so? Manifestly, it did not; and if not, how else was the alleged disqualification made to appear? It must not be forgotten that by all the presumptions of law he was qualified, and that no mere random declamation could render him otherwise.

But again: the offer was, at best, but a loose, vague generality. It contained no specification of the particular cause, or facts, from which the alleged impartiality, or prejudice, was to be inferred. It did not state that the juror had formed or expressed an opinion as to the guilt of the accused. It did not assert personal enmity or hostility, or that an action, implying malice or displeasure, was pending between the juror and the defendant, or that the cause had happened since he was sworn.

It is also observable that the court in overruling the offer in the shape in which it was presented, pointed out its prominent defects, and thereby plainly signified how a renewed offer might have been shaped. The court in overruling the offer, among other things, said: "This offer to challenge is "made the day after the impanelling, organizing, and swear-"ing of the grand jury. No cause is assigned or shown for "this delay. * * * The proper time to object to the com-"petency of this juror, would have been on yesterday, and "before he was sworn. Then there was abundant oppor-"tunity for such purpose. * * * * This offer does not "declare any newly discovered information as to this juror;

" it pre-supposes that what is stated to-day, at this late hour
" of the proceedings, was known yesterday, before the juror
" was sworn."

Here were at least two things about which the court desired
to be satisfied; first, the reason for the delay and default;
secondly, whether the alleged cause of challenge was, or was
not, discovered after the swearing of the juror? Was this
unreasonable? Or rather was it not the duty of the court to
inquire into them? But no response was made. The de-
fendant and his counsel stood mute. After such notice as the
above, that no renewed offer was made, affords strong pre-
sumption either of the incorrectness of the first allegation
and its abandonment, or of an inability to comply with the
requirements of law.

It is quite true the court at the same time remarked that it
had " heretofore decided that the Code of Criminal Procedure
of 1862-3, is not in force," etc. But it is a very grave mis-
apprehension to assert that the court disallowed the challenge
solely upon the ground of the repeal of that statute. The
offer to challenge, in the shape, and under the circumstances,
in which it was presented, was refused because the court,
under objection made, considered it improper and unlawful to
receive it. And this is the very question—no matter what re-
marks, whether correct or incorrect, the court may have made
at the moment. The precise question was whether the imme-
morial and then existing law, as binding on the court itself
as it was on parties, that after the jury is sworn it is too late
to take or to allow a challenge, except for good cause shown,
was to be treated as if it had no place in our jurisprudence,
or if so, whether it should be tossed aside at anybody's whim
or suggestion.

This was the point squarely brought before this court, and
the majority concede (to again refer to their own language)
that—" if, therefore, the Statute of 1862-3 was not then in
force, the court below, by its rulings, so far as the same are
presented by the motion in arrest, gave the defendant all the
rights to which he was entitled." But contrary to their fur-
ther views, I also affirm that if that statute was then in force,

the defendant was, nevertheless, accorded all the rights to which he was entitled, under a true interpretation of that statute. And first as to the above concession. It means that according to the procedure, practice, and pleadings at common law, as assimilated to the procedure, practice, and pleadings on the Federal side of these Territorial courts, there was no error. To fully understand this, and the positions that are to follow, let me adduce some of the authorities at hand.

In Bacon's Ab., Vol. 5, page 365, is the following: "It is laid down as a rule, that no juror can be challenged without consent after he hath been sworn, either in a criminal or civil case, * * * unless it be for some cause which happened since he was sworn." "The jurors must be challenged, if at all, before they are sworn, or the oath of affirmation tendered to them." 2 Hawk., C. 43. § 1. In 1 Archbold, 554, in quoting Coke, Hawkins, and Chitty, it is said—"this last author maintains that the proper time for challenging, is between the appearance and the swearing of the jurors. And this seems to be the true-doctrine. The challenge of a juror must be before the oath is commenced." Wharton states that after the grand jury is assembled, the first thing, *if no challenges are made*, or exceptions taken, is to select a foreman. In the case of Mima Queen, 7 Crauch, 297, C. J. Marshall (as to an objection to the qualifications of one of the jurors, made after the juror was sworn) said—" whatever might have been the weight of this exception if taken in time, the court cannot sustain it now. The exception ought to have been made before the juror was sworn." "The grand jury as sworn is always presumed to be competent, unless the contrary appear." 2 Hale's P. C., 162. Bishop on Criminal Procedure says—" if parties choose to have their cause tried by prejudiced or otherwise incompetent jurors, who are tendered to them according to the forms of law, they can do so; and if they know of the cause of challenge, and do not take it *at the proper time* while the jury is being impanelled, they cannot avail themselves of the defect afterward. If a party declines to take an objection while the jury is being impanelled and sworn for the cause, he cannot ordinarily take it afterward." In *Reg. v. Frost*, 9

Car. & P., it was laid down that the challenge of a juror, either by the Crown or by the prisoner, must be before the oath is commenced, and the moment the oath is begun it is too late. This, says Bishop, may also be deemed, in substance, the American doctrine. In 3 Wendell, 314, *The People v. Jewett*, the practice at common law was stated by Ch. J. Savage to be, that causes of challenge to grand jurors, " to be availing, *must be made previous to the juror being impanelled and sworn*." And said Marcy, J., in the same case—" it is not so vitally important to persons accused that grand jurors should be beyond all exceptions, as that petit jurors should be so." In *Musick v. The People*, 40 Ills., 268, where the cause of challenge was that members of the grand jury had expressed the opinion that the accused was guilty of the charge, the practice at common law was also held to be, that " the " objection should be taken, as in the case of a petit juror, " before he has taken the oath. Otherwise great inconvenience " and delay, if not an obstruction to the administration of "justice, might ensue." And such was the rule adopted in the trial of Col. Burr. In the *Comm. v. Clark*, 2 Browne, Pa. R., 323, the challenge to the grand juror was made *before* the grand jury were sworn, contrary to the erroneous statement in the text of Mr. Wharton. So in the *Comm. v. Tucker*, 8 Mass., 286, the objection to the grand juror was taken before he was sworn. The time for a prisoner to make his challenge, is when the juror is tendered, and before he is sworn. *State v. Patrick*, 3 Jones, Law N. C. Where a juror can be challenged for cause, the right must be exercised before the juror is sworn. *State v. Bunger*, 14 La. An., 461; see also 23 Pa., 12. An omission to challenge at the proper time, is a waiver of all objection to a juror, in like manner as an omission to plead a defense is a waiver of the defense. 20 Bar., 278. In *Clark v. The Territory*, 1 Wash. Terr., 82, held—that on a trial for murder, a failure on the part of the defendant to ascertain the qualifications of a juror by putting him upon his oath prior to being impanelled, is a waiver of any objections on that ground. And so if the defendant know of the incompetency of the juror, and permit him to be sworn without challenging him. 5 Ind., 122; 7 Ind.,

63; 15 ibid., 347; 16 ibid., 298; 2 Bld., 114. And if the defendant had full knowledge of a valid objection to the juror at the time he was impanelled and sworn, and does not object to him, this is tantamount to accepting the juror. *Barlow v. The State,* 2 Blackf., 114; *Lisle v. The State,* 6, Mo., 426. In *People v. Sanford,* 43 Cal., 31, the court say—"it was the duty of the defendant in the first place to have examined the juror as to his competency at the time the jury was impanelled."

But it is useless further to multiply authorities. The almost universal rule at common law is, as stated in 40 llls., towit: that the objection should be taken, as in the case of a petit juror, before the grand juror has taken the oath. If in the case of a petit juror who is to sit on "the jury of life and death," it is essential that a challenge, peremptory or for cause, must be taken before he is sworn, *a fortiori* must a challenge to a grand juror for cause, be made before he is sworn. For the grand juror does not try offenses, but only inquires into and presents them to the court by indictment. Hence the remark of Marcy, J., in the case in 3 Wend., quoted above. If such strictness is to be observed with regard to trial jurors, should not even greater exactness be required as to grand jurors? In fact, the actual existence of a cause of challenge to the latter, is generally considered of so little importance that in most cases it is not exercised.

Whilst it thus appears that the nearly universal rule is that it is too late after the jury is impanelled and sworn, to inquire into the impartiality or incompetency of a juror, yet if it be discovered subsequent to oath, that he is prejudiced or otherwise incompetent to serve, he may, for *good cause shown,* and in the exercise of a sound *discretion,* be set aside by the court. As to this permissive or discretionary power, Mr. Bishop says this—" but where the defect was unknown at the time, the courts will *permit* the party injured by it, to take advantage of it afterward, in some circumstances, and to an extent which no general statement can define. In *U. S. v. Morris,* 1 Curtis C. C., 23, it was held that although neither party has a right to challenge after a juror is sworn, yet that it is a motion within the discretion of the court. In Virginia it has been held

that after a juror has been elected and sworn, the court *may*, if it please, as a matter of discretion, permit the prisoner to challenge him for cause. *Tooel v. Commonwealth*, 11 Leigh, 714. So in *U. S. v. Blodgett*, 35 Ga., 336, it was said that challenges to members of the grand jury *may* be heard after the body has been fully organized, provided there is reasonable excuse for the delay. Also, in *The People v. Danon*, 13 Wend., 352, Ch. J. Savage held—" the regular practice is to challenge jurors as they come to the book to be sworn, and before they are sworn; but I apprehend this is a matter of practice, and may be departed from in the discretion of the court."

But enough has been quoted to show the tenor and force of the common law on the subject. It remains now to be seen in what essential particular the Statute of 1862–3 (assuming that it was and is in force) differs from the common law. What statute, as to the challenging of petit jurors declares that a challenge to the panel must be taken before a jury is sworn; that a challenge to an individual juror must be taken when the juror appears, and before he is sworn; but the court may, for good cause, permit it to be taken after the juror is sworn, and before the jury is completed. In relation to grand jurors, it gives a challenge to the panel for three specified causes, and a challenge to any individual grand juror for six enumerated causes, most of which may be taken by either party—that is to say, by either the prosecution or by the defendant. But it has also the following section: " A person held to answer a charge for a public offense, *may* challenge the panel of the grand jury, or any individual grand juror, before they retire, after being sworn and charged by the court." Now although this section seems to be a stumbling-block to the mental vision of the majority of this court, yet to my mind it is perfectly clear it is nothing but a substantial repetition of the permissive or discretionary power of the common law in the premises, as the same is accurately set forth in the other section relative to the proper time for challenging individual petit jurors. It is but a paraphrase of the other one, which itself embodies the common law exception. Both sections, with all the others relating to challenging, must be construed

together; and there is nothing in either of them imperative or mandatory. They are, as heretofore remarked, purely declaratory of the common law; and neither of them confers any new right, or entitles an accused party to any additional privileges. The right of challenge, as to the proper time for its exercise, is still limited to the period before the swearing of the juror; afterward, the right ceases, and it becomes a matter to be permitted, or not, as the court, in its discretion, for good cause shown, may see fit. But if the right exists afterward, as contemplated by this decision of the court, what is to compel a party to take his challenge beforehand? All order, regularity, and decorum would thus be subverted, and the due administration of justice would be clogged in the most fantastical and dangerous manner.

Any other construction than the one I have given—which is the natural and obvious one—would involve the monstrous absurdity and the solemn farce of forming, swearing, and charging the grand jury, before challenges to the panel and to its members would commence. The ancient, regular organization of the body of the inquest, with the charge of the Judge superadded, would be but the idle prelude to the testing of the competency of the individuals. The *voir dise*, losing its appropriate place, would be postponed to the oath in chief, and the whole meaningless process would be like to the building of an edifice only to tear it down. If some of the members should be set aside, and their places filled, the party might again wait until after a fresh swearing in chief, and another charge from the Judge, and then once more demand this so-called right. Or, in this manner, all might disappear, and a new body would have to be brought in, with the prospect of an infinite continuance of the same irrational, if not nonsensical, procedure. And the above, it is to be regretted, is not a fanciful, overdrawn picture of the absurdities to which the law as now laid down might lead; for it is of judicial cognizance that we have actually had in this Territory, such practical exemplification of the necessary outgrowth of this lame construction.

The reason of the law is the life of the law; and, without

some reason for it, the meaning given to this Statute of 1862–3, by the majority of the court, would involve it in absurdity. And the rule is, that every interpretation that leads to an absurdity ought to be rejected. We must prefer the evident meaning of the whole law, to the inconsistent meaning of a defective expression. Every part of this statute must be viewed in connection with the whole, so as to make all its parts harmonize, and give a sensible and intelligent effect to each. If the words of one section are obscure, the intention may be found from other sections *in pari materia*, for every legislative act must have reasonable construction. In Minnesota, from which this statute appears to have been borrowed, Emmett C. J., in reviewing this identical section, declared " that the language of the statute is permissive only." 3 Minn., 444, *Maker v. The State*. Therefore, in conclusion of this branch of the subject—even if the Statute of 1862–3 was then in force, it is firmly maintained that, by the true interpretation of it, the defendant's *right* to challenge Mr. Delamater ceased when he was sworn in as foreman, and when the grand inquest was organized according to law, on the 16th of April. Also, that afterward, and on the 17th, it became a mere matter of practice, altogether permissive and discretionary on the part of the court, under all the circumstances. And further, that the court below was fully justified in exercising that discretion as it did, and that its action was not consequently properly reviewable in this court.

I dissent from the decision of the majority of this court for another reason, and shall proceed to state it. Going upon the assumption that the said statute was and is in force, I hold that the defendant by voluntarily pleading " not guilty " to the indictment, and by demanding to be tried " by the country " on the merits, became precluded from afterward taking this objection. It seems to have been forgotten by the majority of the court that this statute appoints and fixes a precise order and rule of pleading. It prescribes that when a defendant is arraigned, "he may in answer to the arraign-" ment either (1) move the court to set aside the indictment, " or (2) may demur, or (3) plead thereto." And first as to the

motion to set aside the indictment; it declares that the indictment must be set aside by the court, in which the defendant is arraigned, and upon his motion, in either of the following cases:

1. *When it is not found,* indorsed, and presented as prescribed in the chapter relating to that subject. That chapter treats of the number, qualifications, drawing, summoning, challenging, and oaths, of grand jurors—of their powers and duties, of the number requisite to concur in the finding of an indictment, and generally of all matters appertaining to the finding of the bill. So that when a true bill is found, and presented to the court, and filed as a public record, if the accused party thinks it was not found in all particulars as set forth in that chapter, it becomes his duty, in order to avail himself of any alleged defect, to move the court, on or before his arraignment, to set aside the indictment. The statute directs that, on his motion, for any of the reasons therein stated, the court must set it aside. The above is, then, the order of pleading established by this statute, giving notice to all parties of the course to pursue, and of the proper time to intervene. And in this order alone may the defendant successively plead all these kinds of pleas and denials. He cannot, at common law, vary the settled order, for by a plea of any of these kinds, he is taken to waive or renounce all pleas or objections of a kind prior in the series. This short and simple form of a motion to set aside the indictment, embraces, as grounds for the motion, any matters of fact tending to impeach the correctness or regularity of the finding. In the case now before us, the defendant had the fullest opportunity, after the filing of the indictment, to present or to renew objections, so as to place them properly and adequately upon the record. If he felt that any of his rights had been prejudiced because the indictment was found by a grand jury not properly constituted or not having the proper authority, he ought to have gone into court, before pleading to the merits, with affidavits or other proof, and made the requisite motion. By this reasonable course he would have placed the whole matter upon the record, and would have also given the court a full oppor-

tunity to judge of the fairness of his application. And if the law and the merits were with him, the time, labor, and expense of a trial upon an imperfectly found indictment would have been saved. But this defendant and his array of counsel freely chose not to pursue the plain course pointed out by the law. He never made, or offered to make, any such motion. And it is rightfully to be presumed that the course he did take, was taken upon due deliberation and of his own free will and accord. Now, throwing aside any common law considerations, what does this very Statute of 1862–3, held by the majority of this court to have been the law, and the only law, applicable to the subject, explicitly declare? Mark its solemn, uncompromising mandate, as obligatory upon courts as upon parties. It declares that " if the motion to set aside " the indictment be not made, the defendant is precluded " from afterwards taking the objections."

The majority of this court knew, or were bound to know, that this defendant was thus precluded; and that, therefore, they had no authority to hear, and no right to pronounce upon this objection. The legitimate and inevitable consequence of all which, is just this: that their own favored and approved statute being the only standard and criterion, the matter alleged as error was *coram non judice*, and they had no jurisdiction. .

And as tending to show that I am not alone in thus construing that statute, I shall quote at some length from the opinion of Lewis, C. J., in 7 Nevada R., 333, *State v. Roderigas*: " It is argued that the indictment is defective, in that it does not show that it was found by a grand jury having the proper authority." To this point it is sufficient to answer that it was not taken by demurrer or by motion at the proper time, and, therefore, under our statute cannot afterwards be raised. Section 275 of the Criminal Code of Procedure, among other things, declares that, " The indictment shall be set aside by the court in which the defendant is arraigned and upon his motion, in either of the following cases:. First, where it is not found, indorsed, and presented as prescribed by this act;" and section 277 provides, that " If the motion to

set aside the indictment be not made, the defendant shall be precluded from afterwards taking the objections mentioned." No motion for this purpose was made in this case. * * * * * * Thus, it will be observed the objection to the indictment that it does not show that it was found by a grand jury having authority to find it, and all objections of a similar character, can only be raised by motion or a demurrer specifically designating the objection."

There is likewise another portion of the Statute of 1862-3, to which, it would appear, due attention was not given. It is as follows: "No indictment is insufficient, nor can the trial, *judgment*, or other proceedings thereon, be affected by reason of a defect or imperfection in matter of form, which does not tend to the prejudice of the substantial rights of the defendant, upon the merits."

Although this Statute of 1862-3 has been already made to perform a very conspicuous part in this case, yet it cannot be dropped without viewing it in the new and strange light reflected upon it by the decision of this court. As to the point now involved, it has been seen it is of no consequence whether that statute was then in force, or was not in force. I am of the opinion, however, that it was not. To comprehend this subject fully, it is important to review the history of the legislation bearing upon it. The first act of the Legislative Assembly relating to criminal procedure was that of April 28, 1862. The second was that of the session of 1862-3, approved January 9, 1863, which repealed all acts or parts of acts inconsistent with it. The third was chapter eighteen of the laws of 1867-8, entitled "An act relating to the challenging of jurors in civil and criminal cases," which repealed all acts and parts of acts in conflict with it. The fourth was chapter nineteen of the laws of 1867-8, entitled "An act respecting grand and petit jurors of the district courts," which repealed chapter fifty-two of the session laws of 1862, and chapter twenty-six of the session laws of 1862-3, and all other acts and parts of acts in conflict with it. The fourth was that of the session of 1868-9, approved January 12, 1869, which

entirely abrogated and abolished all modes of procedure before enacted—pending proceedings alone excepted.

This was the condition of the legislation on the subject from the last named date until January, 1873. Within a period of about ten years, the people of the Territory had witnessed the existence of all these laws, and then the repeals as above specified. Their Legislative Assembly had deliberately discarded the Code of 1862–3, after six years' trial of it. The Code of 1868–9 had been undergoing a probation of about four years. It is evident there was dissatisfaction. None of these codes, it seems, answered the wants and interests of the public. The people had been learning in the school of experience. From the first organization of the Territory, they had seen that, in criminal cases on the Federal side of their courts, the proceedings, practice and pleadings were in accordance with the common law, as regulated and modified by Acts of Congress and decisions of the Federal courts. This mode of procedure was working smoothly and effectively; and was, it is likely, affording a higher degree of satisfaction, than was to be derived from the operations of crude, perplexing, and awkwardly jumbled codes, borrowed from the statutes of various States. Instead of two differing systems in the same court—one for Federal cases, and the other for Territorial cases—it was, no doubt, deemed expedient to have but one. That this was the feeling and desire of the people, is deducible from the fact that, on the 8th of January, 1873, their representatives in the Legislative Assembly enacted the following law:

An act to repeal chapter first of the laws of 1868–9, entitled "An act to establish a Code of Criminal Procedure for Dakota Territory." Approved January 12th, 1869, and for other purposes.

*Be it enacted by the Legislative Assembly of the Territory of Dakota:*

SECTION 1. That chapter first of the laws of 1868–9, entitled "An act to establish a code of criminal procedure for Dakota Territory," approved January 12th, 1869, be, and the same is, hereby repealed.

SEC. 2. That from and after the passage and approval of this act, the proceedings, practice and pleadings in the dis· trict courts of this Territory, in criminal cases, shall be in accordance with the proceedings, practice and pleadings of the common law, except where the same is otherwise expressly regulated by law, and such proceedings, practice and pleadings shall be assimilated as near as may be with the proceedings, practice and pleadings of the United States or Federal side of said courts. *Provided*, That chapter eighteen, of the laws of 1867–8, entitled "An act relating to the challenging of jurors in civil and criminal cases," and chapter nineteen of the laws of 1867–8, entitled "An act respecting grand and petit jurors of the district courts," shall remain in full force and effect.

SEC. 3. Writs of error, bills of exceptions and appeals, shall be allowed to the defendant in all criminal cases, when required by him, under such rules and regulations as the supreme court of the Territory may prescribe; and the said supreme court shall, at its first annual session, make all necessary rules and regulations to carry this section into effect.

SEC. 4. This act shall take effect and be in force from and after its passage and approval.

Approved, January 8th, 1873.

Here is a statute that has nothing obscure, ambiguous, or doubtful about it. The words embody a definite meaning, involving no incongruity or absurdity. There is no contradiction between its different parts. The thought which it expresses is lucid and manifest. The meaning is apparent on its face, and that meaning is the only one which we are at liberty to say was intended to be conveyed. In this case there is no room for construction. The meaning which the words declare, is the meaning of this statute; and neither the courts nor the legislature have a right to add to, or take from that meaning. (7 N. Y., 99; 11 N. Y., 593.) It is not permitted to interpret what has no need of interpretation. When an act is expressed in clear and precise terms; when the same is manifest and leads to nothing absurd, there can be no reason not to adopt the sense which it naturally presents. To go

elsewhere in search of conjectures in order to restrain or extinguish it, is to elude it. (13 N. Y., 78; 9 Barb., 161; Vattel, B. 2 Ch., 17, § 263; 2 Crauch, 358.) Courts are bound to seek for the intention of the legislature *in the words of the act itself*, and they are not at liberty to suppose or to hold, that the legislature intended anything different from what their language imports. (7 Hill, 513.) And the intention thus derived, it has always been held, is the best guide in the construction of statutes. (3 Wheat., 631; 8 N. Y., 535.) In the second section is given a familiar, simple, and perfect substitute for all past codes of criminal procedure. The common law mode, assimilated to that on the Federal side of these courts —that is to say, the common law as expressly regulated, moulded, or modified, by Acts of Congress and the decisions of courts, and by any existing local laws, is prescribed as the sole rule of proceedings, practice, and pleadings, in all cases arising thereafter.

The legislature, moreover, looking back over the vista of the entire life of the Territory, and over all the prostrate and defunct codes, deliberately selected, from the ruins and the rubbish, only two enactments of them all, naming them, to-wit: chapters eighteen and nineteen of the laws of 1867–8, and expressly declaring that these two portions of the entire debris should be revivified, and remain in full force and effect; and thereby, by an established rule, excluding and reprobating all others not named. And in the third section, in lieu of the abrogated provisions as to writs of error and appeals, they substituted such rules and regulations as the Supreme Court might prescribe. The legislature had sense enough to perceive that after all that could be said in their favor, these codes were but attempts to enunciate and to arrange the rules and maxims of the common law, with which every lawyer and judge was supposed to be acquainted. They preferred to leave the whole matter to the courts, rather than any more to trust in the efforts of codifiers who had given them, instead of what was applicable to their territorial condition, ill-digested and incongruous laws, hastily patched up from the statutes of different States.

The People vs. Wintermute,

One is at a loss to know what can be plainer than this statute. The intention, the reason, the thought of the law—the mischief and the remedy—all are equally perspicuous. Very many people will inquire what there is in it, which can possibly betray the slightest intention to revive the Statute of 1862–3. They will naturally ask, by what legerdemain of logic or law—by what subtile, occult process—could such a result be achieved? But the curious on the subject must resort to the opinion filed on behalf of the majority of this court. There they will see that an antique rule, (unsuited to the genius of our institutions, and declared by the sovereign law making power of the Territory to be Anti-American,) which, at all events, whether in force here, or not in force, has no possible application to this statute, has been invoked and forced into unwonted and grotesque service. They will find that a depletive process is adopted by which the interpreter of the law strangely stops short at the end of the first section, in order to call in this ancient rule, and refers to Dwarris, without quoting from that author. But even Dwarris says that " By the repeal of a repealing statute, (the new law con- " taining nothing in it that manifests the intention of the leg- " islature that the former act shall continue repealed,) the " original statute is revived." '

They will, furthermore, perceive that an Act of Congress which declares that, "Whenever an act shall be repealed which " repealed a former act, such former act shall not thereby be " revived, unless it shall be expressly so provided," is not, in a Territorial court, entitled to receive even as much consid-eration as a mere opinion of some State court.

They will see, finally, that in violation of a mandate which declares that the common law shall be the rule, except where the common law is otherwise *expressly* regulated by law, a dead statute is resurrected by the sheer force of *implication*.

But to conclude: Other arguments and authorities bearing upon the case, might be given. I have, however, neither time nor inclination to pursue the subject any further. I have ex-pressed my opinion and the reasons therefor at far greater

length than I could have wished, but the importance of the case must furnish my excuse.

In my opinion the judgment should be affirmed.

SEPARATE OPINION OF ASSOCIATE JUSTICE BARNES: I did not intend to, and probably should not have felt called upon to file a separate opinion in this case, were it not for the fact, that in the dissenting opinion filed, the Chief Justice seemed to assume, or at least to convey the idea, that the majority of the court, by their decision, affirmed and approved all the rulings of the court below, as well as the instructions to the jury, and the refusal to give other instructions asked for. Such, however, is not the case. The Supreme Court pursued the usual course, viz.: Where the appellate court determine that there is error in the proceedings of the court below, anterior to the trial of the case, and which sends the case back to be again acted upon by a grand jury, the appellate court seldom allude to alleged errors upon the trial, or to instructions to the petit jury. I think the Chief Justice well understood that his associates did not, and could not indorse or approve his argument or instructions to the jury, or his manner of disposing of a number of the instructions asked for, by the defendant's counsel. The majority of the court purposely left the charge of the court below, and the manner of giving and refusing instructions, judicially untouched. The discussion of those matters in the dissenting opinion was unnecessary for the disposal of the case. •This case was brought into this court for review; the counsel for the prosecution and defense submitted their points, briefs and arguments, and by agreement made in open court, read such portions of the record of the trial and proceedings in the court below, as the counsel agreed was necessary to a full understanding of the case under review in the Supreme Court.

The court sanctioned this usual and reasonable practice, and acted upon the records, points, briefs, and arguments then submitted. After this case has been decided, and upon the case thus presented in the Supreme Court, the Chief Justice, from a different standpoint, presents an argument more

elaborate than any before submitted to the court. This argument being new as well as novel, seems to demand some slight notice from me. The Chief Justice affirms that if the section of the Statute of 1862-3, which gives the defendant the right to challenge a grand juror after the grand jury has been sworn and charged, is merely declaratory of the common law, conferring no right, then there is an end to all doubt and question. Precisely so, and upon this point there seems to be no difference of opinion; for if this statute secured to the defendant no right—or in other words, if this statute of 1862-3 is entirely meaningless, and leaves the right of chal-lenge just where it existed at common law, then of course there is no error in disregarding its provisions. This is the view taken by the majority opinion. The Chief Justice then proceeds to reproduce in his opinion, the record of what transpired in this case prior to April 17th, 1874. I am en-tirely unable to discover, that the record here reproduced has the remotest bearing on the question under consideration. If the Statute of 1862-3 secured to the defendant no right, but left the rule as at common law, that ends the whole contro-versy and the reproduction of the record is unnecessary. If the Statute of 1862-3 in fact does secure to the defendant rights, which he was not entitled to as a matter of right at common law, and the exercise of such rights was denied de-fendant in the court below, then the reproducing of this record is of no moment, for when produced, it simply substantiates just what is claimed by the defendant, viz.: that the right to challenge the grand juror Delamater, after being sworn and charged, was denied defendant. The reproducing this record tends only to obscure and conceal the real question. No good lawyer will claim, and certainly the Chief Justice does not mean to be understood as claiming, that the fact that the rec-ord shows that prior to the swearing of the grand jury and prior to the time that the jury was charged and instructed by the court, a prisoner could in advance waive a right that was then not his.

Let us state this more clearly and strongly. Assuming that this Statute of 1862-3 means what it says, viz.: that after

the grand jury has been sworn and charged, a person held to answer for a public offense, may challenge, etc., then I assert, the person so held could not even by stipulation made prior to the swearing of the grand jury, have deprived himself of the right to challenge after the swearing of the jury. The prisoner would no more be bound by an agreement of this kind if made, than would a prisoner be bound by an agreement made in advance, that if a grand jury found an indictment against him, he would plead guilty to the charge. But the Chief Justice says—the defendant expressed himself satisfied with the jury and wanted them sworn. This is true, undoubtedly, for until they were sworn, he had no way as a matter of legal right, of ascertaining whether they were proper persons to act in his case. Any objections prior to that time would have been addressed to the discretion of the court.

While the Chief Justice affirms with so much earnestness, that no accused party ever had a fuller or fairer opportunity for asserting his legal rights, upon the organization of a grand jury, than was accorded the defendant, I assert that it plainly and palpably appears from the record of the court below, that the defendant was denied a plain, substantial legal right.

This court will not stop to inquire to what extent this error may have prejudiced the defendant, but will only inquire, could it have prejudiced the defendant? For this court at this present time, in the case of *Yankton County v. Rossteuscher*, has declared the rule to be this—that where improper evidence was received under objection, the appellate court will not stop to ascertain whether the improper evidence was in fact, prejudicial to the party objecting, but will only examine sufficiently to ascertain whether it could have injured the objecting party; and this rule was most strenuously insisted upon by the Chief Justice. I think this rule is binding upon this court, and is properly applicable to the question now under consideration.

But again: The Chief Justice argues at great length and cites innumerable authorities to establish another conceded proposition—namely, that at common law it is too late to

challenge a juror, after being sworn, except by permission of the court. In other words, at common law, a person held to answer a public offense, cannot as a matter of legal right, interpose a challenge to a grand juror, after the jury is sworn. This is the expressed opinion of a majority of this court. It is a proposition no lawyer will attempt to controvert, and yet the Chief Justice cites some forty authorities and makes a long argument to prove this conceded proposition. But just here is the difference between the common law and the statute of the Territory. The session laws of 1862-3, Criminal Code, § 13, provides—that a person held to answer a charge for a public offense may challenge the panel of a grand jury, or any individual grand juror, before they retire, after being sworn and charged by the court. This secures to the defendant by positive law, that which before rested on the discretion of the court. Now how does the Chief Justice seek to · avoid the plain provisions of this statute? Simply by asserting that the legislature did not intend to enact, what they did in fact enact; but that on the contrary, the legislature intended to say, that a person held to answer a charge for a public offense, shall not be permitted to challenge the panel of the grand jury or any individual grand juror after they are sworn and charged by the court. This proposition may be admired for its boldness if for no other reason; but the curious will naturally inquire, if this statute secures to the accused no right he did not possess before, why legislate at all upon the subject? All such inquisitive persons are most respectfully referred to the elegant argument, filed in this case, by the Chief Justice. They will there find that while the legislature intended to enact and supposed they had enacted a law, plain and reasonable in its provisions, that in point of fact, they enacted no law at all. But really what reason does the Chief Justice assign for mangling and crucifying this law, which in furtherance of justice, aims at securing true and impartial men, and those only too, as grand jurors.

He says that when the court delivered his charge to the grand jury, it was a public judicial recognition of its official existence as an appendage of the court—when once created a

lawful body it was to remain such until dissolved and broken
in some manner pointed out and allowed by law.  This is
true, and the error is to be found in the fact that when the
defendant, in the way pointed out by law, sought to break
this jury and challenged the juror Delamater, the court uncere-
moniously turned him away and said to him, " that law under
which you seek to break the jury is repealed." (Mark the
language.)  Then it was not claimed that the law prior to its
repeal was of no force or effect, but the right to challenge
was denied, and so stated by the court below on the ground
that the law of 1862-3 was repealed, and the defendant's
counsel was admonished that if they were allowed to challenge
lenge a grand juror, it was a matter of grace and favor and
not because of a legal right so to do.  And the Chief Justice
in his argument on file in this case asserts that the court below
pointed out and intimated, and indeed almost besought the
defendant's counsel to excuse their default, and come in in
some other way, and they would not.

The Chief Justice in his argument urges as another reason
why the challenge should not be allowed as claimed by the
defendant, that its effect would be to disintegrate the grand
jury, and yet he asserts that the court below in the exercise
of its discretionary power, could allow the challenge after the
grand jury were sworn and charged.  This naturally suggests
the inquiry—would not the disintegration of the grand jury
have been the same had the challenge been allowed under the
discretionary power vested in the court below, that it would
have been if allowed under the provisions of the Statute of
1862-3?  But the Chief Justice has still another reason.  He
says:  In view of the solemn oath the juror Delamater had
taken, this was a grave charge against his honor and reputa-
tion and tending to his infamy.  Truly this is a most remark-
able statement.  If under such circumstances the challenge
allowed by law, is a reflection upon a juror, would it be any
the less so were it addressed to the court, and the challenge
urged as a matter of favor excusing the default in not having
made it sooner?  But it is no reflection; it might as well be
asserted, should a defendant avail himself of the provision of

The People vs. Wintermute.

the statute allowing him to present his affidavit that the Judge of the court in which he was to be tried for a crime was prejudiced against him and upon that affidavit to ask for a change of venue to some other court, was a reflection upon the honor and integrity of the Judge, and yet this is the almost universal practice in criminal courts. But assume that it is a reflection, is the defendant to be deprived of a legal right, or is a plain statute to be disregarded because the exercise of the right or the enforcement of its provisions may chance to hit somebody? Laws tending to secure a fair and impartial investigation, are to be liberally construed.

I fail to discover that the Chief Justice has given one good reason for asserting that this statute of 1862–3 is only declaratory of the common law. Surely he will not claim that inasmuch as the courts in their discretionary power at common law could exercise this authority, that, therefore, the legislature did not intend to declare as a matter of absolute right, that a defendant under certain circumstances might challenge a jury or a juror, and without permission of the court. I think I am safe in saying that the history of all legislation in this country, as well as in England, for a long period of time, has tended strongly in the direction of securing to parties charged with crime, such rights as they were entitled to, and divesting courts of discretionary power in all cases where it is safe and prudent to do so. Why should the right to challenge a juror be in abeyance, subject to the will or caprice of court or judge? The time was in England and of comparative recent date, when the allowance or refusal of a writ of error was a discretionary power. So in the matter of bail, courts and officers had almost unlimited power to grant or refuse bail. Now in most cases it is secured to the accused by legislative enactment as a legal right, and I might cite innumerable instances of it were it necessary.

Again the Chief Justice says: "I dissent from the decision of the majority of this court for another reason, and shall proceed to state it. Going upon the assumption that the said statute was and is in force, I hold that the defendant by voluntarily pleading not guilty to the indictment, and by de-

manding to be tried by the country on the merits, became precluded from afterwards taking this objection. It seems to have been forgotten by the majority of the court that this statute appoints and fixes a precise order and rule of pleading. It prescribes that when a defendant is arraigned, he may in answer to the arraignment, (1) move the court to set aside the indictment, (2) may demur, or (3) plead thereto. And first as to the motion to set aside the indictment; it declares that the indictment must be set aside by the court, in which the defendant is arraigned, and upon motion in either of the following cases: when it was not found, indorsed, and presented as prescribed in the chapter relating to that subject."

Now, first, I assert that the statute referred to by the Chief Justice, is not correctly given by him. The provisions of the statute on that subject: Section 1, chap. 21, Criminal Code of 1862–3, contains this provision—"the indictment must be set aside by the court in which the defendant is arraigned, and upon his motion in either of the following cases: First, when it is not found, indorsed, and presented as prescribed in chapter 32." Now the Chief Justice has depleted this statute by leaving out the words "in chapter 32," and adding the words "in the chapter relating to that subject." This perversion of the statute is significant and important, in the investigation of this matter, as chapter 32 referred to, contains no provisions upon the subject, and the Chief Justice has no warrant or authority for mutilating this statute, or for claiming that when the legislature referred to chapter 32, they mean or intend to refer to some other statute. But yielding this point for a moment and assuming that they intended to refer to chapter 18, laws of 1862–3, as this is the chapter relating to grand juries;—now while I do not concede that in a criminal case the court has the right or authority to say, that when the legislature refer to chapter 32 that they mean some other chapter; yet, as chapter 32 does not refer to grand juries and chapter 18 does, I shall assume that chapter 18 was intended by the legislature when they say " 32." And how does this question then stand? Now § 1, chap. 21, Criminal Code of

1862–3 provides, " that the indictment must be set aside by the court in which the defendant is arraigned, and upon his motion in either of the following cases: when it is not found, indorsed, and presented as prescribed in chapter 32," meaning chapter 18; " when the names of the witnesses examined before the grand jury, are not inserted at the foot of the indictment, or indorsed thereon, or when a person is permitted to be present, during the session of the grand jury, while the charge embraced in the indictment, was under consideration, except as provided in section 42." Then section 2 provides, " if the motion to set aside an indictment be not made, the defendant is precluded from afterwards taking the objection mentioned in the last section."

Now, first, let us see how the Chief Justice has depleted this section, for it is the only section in which the language quoted by him is to be found. He has despoiled this section 2 by leaving out the qualifying words, viz.: " mentioned in the last section." With that section thus depleted, and then by omitting to refer to the five specific objections, which are considered waived unless taken by motion, the inference would seem to be irresistible from the arguments of the Chief Justice, that all objections to the indictment, or to the drawing, impanelling, swearing and challenging of the grand jury, were waived unless the objection was taken by motion. Such, however, is not the case. There are five objections that must be taken by motion, if taken at all. Now § 60, chap. 18, Criminal Code of 1862–3, provides that an indictment cannot be found without the concurrence of at least twelve grand jurors. • Same section provides, the indictment must be indorsed a true bill. Section 64 provides, that it must be presented by the foreman of the grand jury to the court, in the presence of the grand jury; and section 63 provides, that the names of witnesses must be indorsed on the indictment. Section 42 provides, that at certain times the District Attorney, and no other person, may be present with the grand jury. Therefore, when the law is fairly stated, the five enumerated objections, all formal and none effecting the question involved in this case, are the only objections that must be taken by motion. But such warping and depleting the

various provisions of the statute never before came under my observation; and here I may as well state, that the Chief Justice is equally at fault in defining the rule at common law. It is true at common law, that if a defendant pleads not guilty that he waives the right to go back and interpose a demurrer or dilatory plea, but it is not true that he is thereby precluded from moving in arrest of judgment after conviction and insisting on the same objections, as error, that he might have presented by demurrer; and good practitioners will seldom demur to an indictment, preferring, in case of conviction, to rely upon a motion in arrest of judgment. I understand this to be a general rule, that if the error complained of, in any way appears as a matter of record, that the motion in arrest of judgment, brings the matter properly before the appellate court. On this point I refer to § 888, Bishop on Criminal Procedure, Vol. 1, second edition; also § 889, same authority.

Now for a moment let us look at the main reason assigned by the Chief Justice for this rule or its enforcement. It is this: that by this motion this matter would be placed on the record. Let us consider that objection. On the 17th of April, 1874, the defendant's counsel challenged the juror Delamater, claiming the right to that challenge under the law of 1862–3. This is no less than a motion to set aside the juror for cause. The court overruled that application, challenge or motion, and declared that the law under which they claimed that right was repealed. To that ruling the defendant's counsel excepted. That exception was signed by the Chief Justice— sealed with the great seal of the court, and marked " Exception No. 4." If by this operation it was not made, and did not become a matter of record, by what process could it be made so? If it was not the view of the court at that time, that this motion and exception, thus became a matter of record, then all this ceremony was a meaningless farce. The reason urged, then, by the Chief Justice, why this motion to set aside the indictment should have been made, is answered.

I have, thus far and at some length, pointed out the errors and inconsistencies of the dissenting opinion in this case, and

particularly on this question of waivure, by reason of the defendant's not making a motion to set aside the indictment; nevertheless I am not quite ready to bid farewell to this question without referring to two or three sections of this same law of 1862–3, which certainly removes all doubt, if any before existed as to the propriety of reviewing this question of the challenge of the juror Delamater, in the Supreme Court. And first I refer to § 46, chap. 32, laws of 1862–3, and there this language will be found: "No assignment of errors, or joinder in error, shall be necessary upon any writ of error issued in a criminal case, but the court shall proceed on the return thereto and render judgment upon the record before them." Now there can be no question that the hearing in the appellate court is upon the record. Then section 43 provides —"when judgment upon a conviction is rendered, the Clerk must enter the same upon the minutes, stating briefly the offense for which the conviction has been had, and must immediately annex together and file the following papers which constitute the judgment roll: first, a copy of the minutes of challenges interposed by the defendant to the panel of the grand jury, or to individual grand jurors and the proceedings and decision thereon." Now is there any question, but what the defendant has pursued the exact course pointed out by law, to have this question reviewed? He has interposed his challenge; he has been overruled by the court below; he has excepted to the ruling and decision of the court. That challenge and proceedings thereon has been made a matter of record; it is a part of the judgment roll; it has by writ of error been brought into this court for review, and here disposed of as a majority of this court determine, in a legal and proper manner.

Still I find another question is suggested by the argument of the Chief Justice. He says: "Here it may be well to observe, that in the opinion of the majority of this court it is considered that Mr. Delamater, was a disqualified grand juror, whose presence vitiated the whole panel. But how was he disqualified? Upon what part of the record does this appear?" It is very apparent that the learned Chief Justice

misapprehends the question.  It is this:  The defendant challenged the grand juror Delamater, on the ground of bias and prejudice against the defendant, and for this reason that he was disqualified from sitting as a juror to investigate the charge against the defendant.  The prosecution thereupon refused to take issue on the allegations of the challenge, and try that issue, but in legal effect admit the challenge to be well taken, except, they aver, that the challenge comes too late, and the defendant cannot avail himself of the disqualification and set aside the juror.  'I he court below sustain this view of the matter and declared plainly that by reason of the laches or negligence of the defendant, this conceded disqualification of the juror could not be made available to the defendant.  It is like the offer in a civil action, by the plaintiff to prove the defendant's signature to a promissory note, declared on.  The defendant objecting to the evidence to prove the signature on the ground that the offer came too late.  The court sustains the objection and says, this offer comes too late and there is no excuse for the delay.  The objection is sustained; the plaintiff excepts; it comes into the appellate court for review.  The question is, was the offer to prove the signature too late?  In the case thus stated, the defendant would not be permitted to assert, that it no where appears that the witness knew the defendant's signature or would have testified that he did.  But for the purpose of determining whether the offer to prove the signature was too late, and whether there was error in rejecting the evidence, it is considered that the offer to prove the signature would have been made good, and that the witness would have testified to its genuineness, and upon this theory the appellate court would determine the question of error.  Or take the case where a party makes a tender.  Now as a matter of law nothing but gold and silver is a legal tender, and yet a party tenders bank bills.  The person to whom the tender is made refuses the tender for the reason as he then states, that the amount is not sufficient.  Now when the question comes to be investigated, was this a legal tender, the only question to be determined is this: was the amount sufficient.  The party to whom the tender is made will not be permitted to urge that the tender

is not valid for the reason that it was only an offer of bank bills. The party, by placing his refusal to receive the tender, on the ground that the amount was insufficient, concedes and admits that in other respects, the tender is good. Or state the proposition in another way. When the defendant challenged the juror Delamater, the prosecution set up in avoidance of that challenge the negligence and laches of the defendant in not interposing the challenge at an earlier period. Now, technically, the matter in avoidance should not have been considered by the court below, unless the prosecution had first, upon the minutes of the court, confessed the causes set forth in the challenge to be true. But the court below did in fact hear the matter, set up in plea of avoidance—namely, the laches and negligence of the defendant without first requiring the prosecution formally to admit the challenge to be true. The matter set up by the prosecution in avoidance of the challenge was held good, and the prosecution thus had the benefit of their plea in avoidance, without the formal confession, which properly should have preceded it upon the record. Having had the full benefit of that plea or matter in evidence, the prosecution cannot avoid the responsibility, that they had confessed the challenge, when they set up or plead matter in avoidance of it. Any other view would deprive the aggrieved party of the right of review, which is provided for by this same Criminal Code. See §§ 43 to 46, inclusive, chap. 32, laws of 1862–3. For if the court below refused to take the testimony as to the truth of the challenge and then on appeal this court says, there is neither evidence of the truth of the challenge nor a legal admission of its truth, then by this course the injured party is deprived of a review. *Such a course cannot be sanctioned.* The prosecution must be held to have admitted the truth of the challenge the moment they set up matter in avoidance of it, the same in every respect as though the admission of its truth was fully spread upon the record.

This brings us to the consideration of the last and only point necessary to be considered, which is the only real and important question in the case, viz.: Was the Criminal Code

of 1862–3 in force in April, 1874? The Chief Justice says, in substance, that in 1872–3, the legislature, looking back over the vista of the entire life of the Territory, and over all the prostate and defunct codes, deliberately selected two enactments, naming them, and declaring these two statutes, to-wit: chapters 18 and 19 of the laws of 1868–9, in force, and by an established rule excluding and reprobating all others not named. The plain reading of the law, as well as cotemporaneous history, to my mind, clearly disproves this assertion. It must be borne in mind that the Criminal Code of 1868–9, had been in force four years. The Criminal Code of 1862–3, had been in force six years. The legislature of 1872–3 deliberately repealed the Code of 1868–9, well knowing that the repeal of the Code of 1868–9 as effectually re-enacted or brought into life or force the Criminal Code of 1862–3, as it would have done had the legislature, section by section, re-enacted it. And whether this doctrine be Anti-American or not it is a rule of the common law, and for this reason if for no other, the Chief Justice will recognize the rule until the law-making power shall see fit to change it. Courts should administer the law as they find it, and not attempt to legislate. Now it will be observed that § 1 of chap. 5, laws of 1872–3 is the section repealing the Criminal Code of 1868–9 and reviving the Criminal Code of 1862–3. Thus far it will be observed, and if we were to stop here all will agree, that the Criminal Code of 1862–3 is in full force. Then section 2 of the same chapter contains this provision—"that from and after the passage and approval of this act, the proceedings, practice and pleadings in the District Court of this Territory in criminal cases shall be in accordance with proceedings, practice, and pleadings of the common law, except where the same is otherwise expressly regulated by law." The words, " except where the same is otherwise expressly regulated by law;" the majority of this court hold, that the language above quoted is the language ordinarily used where it is necessary to add to statutory enactments relating to practice or pleadings, a saving clause, to the end that where legislative enactments are not full or complete, that the common law shall

come in in aid of the statutory provision.  So far as I have been able to discover, a provision similar to the one under consideration and for the accomplishment of the same purpose, has in every instance where there has been a radical change from the common law to the code practice, been inserted. To illustrate: take section 526 of the Criminal Code of this Territory, passed at the session of 1874–5, you have this language—"that from and after the taking effect of this act the procedure, practice and pleadings in the district courts of this Territory, in criminal actions, or in matters of a criminal nature, not specifically provided for in this code, shall be in accordance with the procedure, practice and pleadings of the common law, and assimilated as near as may be with the procedure, practice and pleadings of the United States or Federal side of said courts."  Now let us compare the controlling language of section 2 of the act of 1872–3 with the controlling language of section 226 of the Criminal Code of 1874–5, and ascertain if there is any substantial difference. It is provided in the Criminal Code of 1874–5 that in all cases not specifically provided for in this code (1874–5)it shall be in accordance with the procedure, practice and pleadings of the common law, and in section 2 of the act of 1872–3 we find this language—"the proceedings, practice and pleadings in criminal cases shall be in accordance with the proceedings, practice and pleadings of the common law, except where the same is expressly regulated by law."  I assert there is no substantial difference—that the intent is this, and this only: that we are to ascertain to what extent there is a Criminal Code or statutory provision to meet all classes of criminal proceedings, and that when statutory provisions are not full and complete the common law comes in and supplies omissions.  This construction is consistent, any other is nonsensical and visionary.  The Chief Justice asserts in substance that the legislature of 1872–3 had become disgusted with all criminal codes, discarded every thing of the kind and embraced the common law.  I can in no sense thus interpret the intention of the legislature, and I think the Chief Justice will be forced to confess if the legislature of 1872–3 were disgusted with criminal codes, enamored with the smooth work-

ing of the common law practice, their love was brief and very unstable—for at the very next session of the legislature, and at a time when the two systems of practice were being thorougly discussed, they unanimously adopted a voluminous Criminal Code. Hence as a matter of history it appears there has never been the hour from the time of the meeting of the legislature of this Territory in 1862–3 to the present moment, that the common law practice has prevailed in the territorial courts in this Territory, and with the exception of the attempt in the Second District, for about one year, to enforce that practice, I know of no effort in that direction. The Code practice, civil and criminal, is essentially American, and whether in the first instance, it was a wise departure from the common law, is not now a question to be considered; the departure has been taken and there will be no backward movement. American ideas never retrograde. I have in the main avoided the discussion of such questions as were discussed in the opinion filed by Justice Kidder.

Having referred to some of the principal points made by the Chief Justice, I have neither time nor the inclination to follow the discussion into the realms of imagination. Whether the defendant is guilty or not guilty of a high crime, is not involved in the question determined by this court—namely, that the defendant was not put upon his trial on an indictment found, indorsed, and presented by a properly constituted and legally organized grand jury. Every man charged with crime is guaranteed a fair and impartial trial according to law. And it is of the utmost importance that the law be determined correctly, administered fairly and impartially, without fear or favor. Whether the opinion of the court of *dernier* resort in this young Territory, meets with the present approval or condemnation of the popular voice, is of infinitely less importance than the calm assurance that all questions submitted to this court will be determined according to law. The organization of the Supreme Court in a territory is liable to some criticism, from the fact that the Judge who sat in the court below and whose decisions are being reviewed, has an equal voice in the final determination of the question in the

appellate court. However honest or able the Judge may be who is called upon to review his own deliberate decisions in the court below, he will often find himself hampered by former opinions formed during the progress of a long and exciting trial, and unable to consider the principles of law with a calm and unbiased judgment; and yet justice and the paramount interests of all, demand that every facility should be afforded a party desiring a review of the questions of law involved in his case, to present the alleged errors in the appellate court, and have them passed upon by Judges, untrammeled and unbiased by influences, too apt to prevail in the court below. By an abiding conviction that the questions of law will be thus reviewed and determined, the Judges of this court will deserve and receive the confidence of all persons who honor and respect the impartial administration of law.

---

NOTE.—Defendant Wintermute being indicted the second time for murder, pleaded a former acquittal, and the venue was changed from Yankton to Clay County. On the sufficiency of that plea the presiding Judge (BENNETT) delivered the following opinion: REPORTER.

It appears from the record that on the 18th day of May, 1874, defendant was placed on trial in the District Court of Yankton county, on an indictment, consisting of but one count, charging him with the crime and felony of murder, to which he pleaded "not guilty," and that on the 3d day of June, 1874, the jury returned the following verdict into court:

"We, the jurors, do not find the defendant, Peter P. Wintermute, guilty of murder, but do find him guilty of manslaughter in the first degree."

Defendant filed a motion for a new trial, and also a motion in arrest of judgment, both of which motions were overruled by the court, and the defendant sentenced to imprisonment in the Penitentiary for the term or period of ten years.

The defendant applied for and obtained a writ of error, and the cause was removed to the Supreme Court. That court, without passing on the motion for a new trial, sustained the motion in arrest of judgment, and ordered "that said judgment of conviction of Peter P. Wintermute of manslaughter, as aforesaid, be arrested and reversed." And that court further ordered, "that said defendant be discharged from his said arrest upon said judgment and conviction, and it is further ordered that said defendant be and he is hereby ordered into the custody of the sheriff of the county of Yankton, to be held by him to answer to any new indictment which may be found agaist him, said Peter P. Wintermute, in the premises, by the grand jury of said county."

The People vs. Wintermute.

That on the 6th day of May, 1875, the defendant was again indicted for the crime of murder by the grand jury of Yankton county. To this indictment he interposes the plea of *autrefois acquit*. The prosecution replies, setting out the record, and to this replication the defendant demurs. On entering his plea, defendant applied for and obtained a change of venue, and the cause was sent to this county.

Generally, the plea of *autrefois acquit* is required to be accompanied by the record, and in that case the demurrer would be filed by the people.

In this case the record is exhibited by the prosecution, as a part of the replication, and defendant demurs. In either case the ultimate question for determination is, as to the sufficiency of defendant's plea.

Without stopping to notice the technical points raised on questions of practice, I shall proceed to examine briefly the main issue presented.

The question seems to be, comparatively, a new one, and arises for the first time in this Territory; and the learned counsel, in their able and exhaustive arguments, have been able to furnish but few, if any, adjudicated cases exactly in point, and we are relegated to principles and analogy for its solution.

Turning to the text books we find that the principle contended for by defendant's counsel, is not so much as mentioned by such writers as Chitty, Wharton, Bishop and Archibold, in their treatment of the subject of motions in arrest of judgment, and their effect when sustained, and their very silence indicate, at least, that it is of recent birth. Not so when the judgment has been reversed, and a new trial ordered. In that case the question whether the defendant can again be put upon trial for a higher degree of crime than the one for which he was convicted on the former trial, has been repeatedly adjudicated, and is ably discussed by some of our writers on criminal law: but is regarded by Mr. Bishop as far from being settled, the authorities being irreconcilably conflicting.

At first thought, the cases would seem to be similar, but it is only when we forget the broad distinction between a case in which a new trial has been granted, and one in which the judgment has been arrested.

A new trial is defined to be a re-examination of the issues in the same court, and is granted on the ground of error in the rulings or charge of the court, misconduct on part of the jury, etc. By arrest of judgment is meant the refusal of the court to enter a judgment where there is error appearing on the face of the record, which vitiates the proceedings.

In the case of a new trial the record remains, and the defendant is tried again on the same indictment. If the judgment is arrested, all the proceedings will be set aside, and judgment of acquittal will be given, and the defendant placed in the same situation in which he was before the indictment was found. But it will be no bar to a subsequent indictment, which the prosecutor may immediately prefer. 1 Bishop's Crim. Pro.. §1110; 1 Arch's Crim. Pro., 672.

I am, therefore, unable to find anything in the authorities on the question of new trials, cited in support of this demurrer, that throws much light upon its determination.

If the record of the former trial was, by the arrest of the judgment, adjudged vicious,.and all the proceedings thereby set aside, on what does defendant base his plea of *autrefois acquit*? On a vitiated record? On proceedings which, on his own motion, have been set aside? On what principle can it be insisted that a party can

claim any right under, or base any plea on, an annulled record, or proceedings that have been vacated?

If, upon the arrest of the judgment, defendant was placed in the same situation in which he was before the indictment was found, how can it be said that he has been acquitted of a crime of which he is not then charged, and never has, in contemplation of law, been charged?

The plea of former acquittal is allowed and sustained on the maxim of common law, that no one shall be brought into jeopardy more than once for the same offense, which is in substance the provision found in our Federal and State constitutions. But counsel for defendant cite and rely upon § 4, chap. 2, Criminal code of 1862-3, as extending and enlarging the causes for, or circumstances in, which jeopardy attaches. That statute reads as follows:

"No person shall be held to answer on a second indictment for an offense of which he has been acquitted by the jury upon the facts and merits on a former trial; but such acquittal may be pleaded by him in bar of any subsequent prosecution for the same offense, notwithstanding any defect in the form, or in the substance of the indictment on which he was acquitted." And § 9, chap. 23, ibid, is to the same effect.

What is the meaning of this common law maxim, as we find it embodied in the constitution?

Judge Story, in commenting on this provision, uses the following terse and comprehensive language:

"The effect of it is, that a party shall not be tried a second time for the same offense, after he has once been convicted or acquitted of the offense charged, by the verdict of a jury, and judgment has passed thereon for or against him. But it does not mean that he shall not be tried for the offense a second time, if the jury have been discharged without any verdict, or, if having given a verdict, judgment has been arrested upon it, or a new trial has been granted in his favor, for in such a case, his life or limb cannot judicially be said to be in jeopardy." (Story on the Const., § 1787.)

When an original indictment is quashed, adjudged bad on demurrer, or when judgment thereon is arrested for a defect therein, it is held that the accused has not thereby been in jeopardy within the meaning of that maxim. (*Commonwealth v. Gould*, 12 Gray, 171.)

Then, following these authorities, if on the arrest of judgment it is held there has been no legal jeopardy, it inevitably follows that the judgment of conviction or acquittal would be no bar to a subsequent prosecution for the same offense, unless the statute referred to has changed the rule.

Let us examine this statute for a moment. At common law if a party were placed on trial on an indictment defective in form or in substance, and even absolutely acquitted on the merits, he might again be indicted and put upon trial for the same offense, on the ground that no legal jeopardy had attached. This statute simply changes that rule, and provides that legal jeopardy shall attach, where at common law it did not; and if the accused is tried and acquitted upon the merits of the offense charged, on an indictment defective in form or in substance, that judgment of acquittal shall be as complete a bar to any further prosecution for the same of-

fense, as if the indictment had been in every respect free from defects in form or in substance. In my judgment, that is the effect of that statute; that is what it means —nothing more and nothing less. It leaves untouched and unchai.ged the effect of an arrest of judgment, or the granting of a new trial. The words "form and substance of the indictment" relate only to the indictment itself, and not to any-thing in the record anterior to the finding of it, and cannot by construction be extended to, and made to include any irregularities in the organization of the grand jury, that may render it an illegal body, and its acts void.

If the defendant had been tried on the first indictment and acquitted on the merits of the offense charged, by a verdict of the jury, that acquittal would have been a bar to another indictment for the same offense, "notwithstanding any defect in the form or in the substance" of the first indictment. "But the effect of quashing an indict-ment is like that of a *nol. pros.* of it, or of its being adjudged bad on demurrer, or of an arrest of judgment for a defect therein after a verdict of guilty has been returned; by neither of which is a defendant acquitted of the offense with which the indict-ment charged him, but is exempted only from liability on that indictment." (*Commonwealth v. Gould*, supra.)

Leaving out of view for the present the effect of the arrest of the judgment, let us inquire whether the defendant was, in the legal sense and within the purview of this statute, *acquitted of the offense charged*. And I unhesitatingly answer no, he was not.

The word "offense," in criminal law, means the doing that which a penal law forbids to be done, or omitting to do what it commands. In this sense it is nearly synonymous with crime. (Bouvier's Law Dic.)

It is a unit, a single offense, and not a series of offenses, or divers and sundry crimes. The act which originated the offense or crime charged in the indictment on which defendant was formerly tried, was a single homicide, related to the same person killed and to one act of killing. (*Lesslie v. The State*, 18 Ohio St., 390.)

In one sense the degree of the crime might be said to attach solely to the crimi-nal and not to the crime; and in order to ascertain the degree of criminality which attaches, it must first be found that a crime has been committed, and then ascertain by whom committed. The circumstances connected with the commission of the offense, will determine the degree of criminality which attaches to the criminal. The arraignment of the defendant is for but one offense; he can, therefore, be found guilty of but one crime, and subjected to but one punishment.

The only effect, therefore—if this were a case in which a new trial had been granted—that could be given to so much of the verdict as acquitted defendant of murder, after the rest of the verdict had been set aside, would be to regard it as find-ing the degree of a crime before it has been determined who is the criminal, or that any crime whatever has been committed.

In other words, if this part of the verdict acquitting the defendant of murder stands, the rule governing all trials for criminal offenses has been reversed, and the degree of criminality determined, while we are yet in the dark as to whether an offense has been committed or if so who is the guilty party.

The question of fact submitted to the jury on the former trial, was whether a criminal homicide had been committed and if so whether the circumstances of aggravation were such as to raise it above or sink it below the grade of man-

slaughter in the first degree. If the finding as to the main fact be set aside, the finding as to the circumstances necessarily go with it.

There can be no legal determination of the character of the malice of the defendant in respect to a homicide, which he is not found to have committed, or rather of which, under his plea of not guilty, he is, in law, presumed to be innocent. (*State v. Behimer*, 20 Ohio St., 572.)

If this reasoning holds good in a case where judgment is reversed and a new trial ordered, *a fortiori* will it where the judgment has been arrested.

It is not pretended, in the argument at least, that the defendant was acquitted of the offense charged, to-wit: a criminal homicide. He is not acquitted of the felonious act of killing; of what then has he been acquitted? Of a degree of a crime? Is that in any sense an acquittal of the offense charged, within the legal acceptation of the term? And yet that is the inevitable conclusion to which we would be driven.

If this part of the verdict, to-wit: "We, the jury, do not find the defendant, Peter P. Wintermute, guilty of murder," is to stand, while the remainder is swept away, it must mean one of two things—either that the jury found if a murder had been committed, which they do not find, defendant did not commit it, or if he did commit it, which they do not find, it was not murder, which would be simple nonsense; or it is an absolute acquittal of the offense charged, for if absolutely acquitted of murder, the greater including the less, he is also acquitted of all the lower degrees which are included in it. And from this conclusion there is possibly no escape. Section 10, chap. 23, Criminal Code of 1862–3, provides: "When the defendant shall have been convicted or acquitted, upon an indictment for an offense consisting of different degrees, the conviction or acquittal is a bar to another indictment for the offense charged in the former, or for any inferior degree of that offense, etc."

I think I have shown the fallacy of the reasoning by which this portion of the verdict is claimed to be in any sense an acquittal of the offense charged and the baneful results that would follow such a construction

But counsel for defendant insist that there were in effect, and in contemplation of law, two separate and distinct verdicts rendered in this case on the former trial. If that be true then there must have been more than one issue tried, more than one offense charged, and if he could be acquitted of one and convicted of the other, why could he not be convicted of both by two separate and distinct verdicts, two judgments pronounced against him, and he subjected to two punishments, or to be punished twice; first, imprisoned in the penitentiary for the term of ten years on one, and then taken out and hanged on the other. Such a proposition needs no refutation. But in fact there was but one issue joined; but one offense charged. Defendant could be subjected to but one punishment, or rather punished but once, and if the jury found the defendant guilty, the degree of criminality which they found to attach, would be incidental, and in no sense constitute a separate and distinct verdict. And the fact that the jury in express language say, "we, the jury, do not find the defendant, Peter P. Wintermute, guilty of murder," makes the case no stronger than if they had simply said, "we, the jury, find the defendant guilty of manslaughter in the first degree," without making any mention of the higher degree.

The People vs. Wintermute.

If the jury by their verdict convicted him of manslaughter, that judgment if not reversed or arrested, would be a bar to a prosecution for murder; if by their verdict they absolutely acquitted him of the crime of murder, that would be a bar to a prosecution for manslaughter; now unite them, *quere*, on what principle of law or reason can they stand together?

In Hurley's case (6 Ohio, 400) the indictment contained three counts. The first charged him with murder in the first degree; the second with murder in the second degree, and the third with manslaughter. The record shows that the jury returned into court and reported that they had agreed that the defendant was not guilty on the first count, but that they could not agree on the other counts. The defendant moved the court to enter on the journal the verdict of the jury as to the first count, which the court refused. The Supreme Court declared there was no error; that a verdict in either a civil or criminal case must be considered an entire thing, that the finding was in law no verdict, and the court did not err in rejecting it altogether. And it is laid down as the general rule that if the jury find only part of the issue, judgment cannot be entered on the verdict.

If the verdict could not be received without a finding as to the minor grades of offense, it is not perceived how it can stand and have effect after the findings as to these grades have been set aside. (*State v. Behimer*, supra; *Lesslie v. The State*, supra, and authorities cited in these cases.)

I am, therefore, clear in the opinion, and so hold, that the former verdict in this case was an entirety, a unit, not severable, and in all its parts must stand or fall together.

Much has been said by counsel to the effect that defendant did not ask to have the judgment of acquittal arrested, that his application was only as broad as his necessities. The legal and legitimate result or effect of a pleading is not to be measured or governed by the wish or desire of the pleader, and if the duplex character of the verdict were admitted as insisted upon by defendant's counsel, their position on this point would not be tenable. A verdict of acquittal on the merits of the offense charged, even though the indictment be defective in form and in substance, is conclusive as against the people; but if for reasons of his own, if such a case were possible after such acquittal, defendant lays his hand on the record, and at his own instance and request it is adjudged vicious, and all the proceedings set aside and annulled, he must take the consequences. He will not be permitted to say it is vitiated and annulled for one purpose, and good and valid for another. If he take hold of the pillars to demolish the edifice for the purpose of getting rid of an enemy, he will do it at the risk of destroying a friend, if there be one within its walls.

I shall, therefore, overrule the demurrer.